# State of Vermont v. Francis Blair

(99 A2d 677)

May Term, 1953.

Present: **Sherburne, C. J., Jeffords, Cleary and Adams, JJ., and Holden, Supr. J.**

Opinion Filed October 6, 1953.

*Joseph M. O'Neill* for the respondent.

*F. Elliott Barber, Jr.*, Attorney General, and *Lewis E. Springer*, State's Attorney, for the State.

**Adams, J.** This case is here on exceptions of the respondent following his trial by jury in the Windsor county court where he was convicted of murder in the first degree. The victim was Elizabeth Weatherup. She, with her husband, lived outside the village of Springfield, Vt. Their house was about 350 feet from the main highway leading from Springfield to Charleston, N. H. A neighbor, Raymond Lamire, lived between the Weatherup home and the main highway.

The respondent and one Raymond Demag were prisoners in the state's prison at Windsor. On the morning of July 30th, 1952, they escaped from the prison by forcibly driving and crashing a truck through steel gates at the sally port leading from the prison yard to the highway. An intensive search was made for them by local and state enforcement officers in the Windsor and Springfield area as the truck was found abandoned in that area.

Late in the evening of August 1 or early morning of August 2, two men entered the kitchen of the Weatherup house by breaking a glass in the door. At that time, Mr. and Mrs. Weatherup were in bed in a room on the ground floor. They were awakened by the noise and arose. After Mr. Weatherup entered the kitchen and when he had nearly reached another outside door, he received a terrific blow on the back of the head. He "let out a yell", then grappled with the assailant, heard his wife scream, received another terrific

blow and slumped to the floor and was "blacked out" for a few minutes. When he regained consciousness, he reached up and unlocked the front kitchen door, arose and made his way down the steps and to the Lamire house as fast as he could. He aroused Mr. Lamire and told him as near as he could what had happened. The police were called and three of them came. Mr. Weatherup was bleeding very badly. It later developed that he had three wounds in his scalp, all of which required stitches, a cut between his fingers that required stitches, ten or twelve puncture wounds in his back and in back of one arm, a fractured rib and right wrist. He told the police very quickly what had happened and that his wife was still in the house.

The police hurried to the house and heard moans coming from the bathroom which was off the kitchen. The door was closed and they pushed it open. They found Mrs. Weatherup partially on the floor with her arms and head over the edge and top of the bathtub. She was unconscious and bleeding badly with a stream of blood flowing from her head into the tub and down the drain. This was shortly before one o'clock in the morning. An ambulance and doctor were called and Mrs. Weatherup was taken to the hospital in the ambulance with the doctor. Mr. Weatherup was taken to the hospital in the automobile of one of the policemen who procured more information as to what had happened. The local police office was again called and also a call made to the nearest state police headquarters and both were requested to send all help possible.

Mrs. Weatherup was unconscious when admitted to the hospital. An examination disclosed profuse bleeding from deep scalp wounds and lacerations through which cracks in the skull bones could be observed and felt. There was bleeding behind and from the ears and also a bloody discharge consisting in part of spinal fluid down the back of the throat. She was in severe shock with probable severe brain damage. She was given oxygen and 2½ pints of blood by transfusion. She died at quarter of six that morning from the above injuries. At the autopsy a puncture wound was found on the outside of the right breast immediately below the arm pit.

The respondent and Demag were apprehended at gun point that forenoon between 11 and 12 o'clock in heavy woods and thick brush about 1½ miles from the Weatherup home by a posse consisting of local and state police and civilians. They were immediately taken to the Springfield police station. They were both wearing coats and pants with Mr. Weatherup's name on them. These were taken from the closet off the bedroom in the Weatherup house. They also had in their possession other articles taken from the Weatherup home including Mrs. Weatherup's purse containing $47.00 in bills and some change.

The injuries to both Mr. and Mrs. Weatherup were inflicted with a piece of iron pipe and the tang end of a file. These were found about one-half mile from the Weatherup home in the mud where the respondent had buried them.

The respondent did not take the stand and testify. His defense was insanity and irresistible impulse due to his mental condition.

The first exception briefed and relied upon pertains to the admission of a confession made by the respondent in the police station during the afternoon following his apprehension. It is in question and answer form as taken by a stenographer in shorthand, transcribed by typewriter on five sheets, each initialed by the respondent. The last sheet was signed by him with an addition in his own handwriting. Some of the answers are in narrative form of various events after the prison break and leading up to the break into the Weatherup home and what transpired there and the flight and capture of the respondent and Demag.

■ The question whether a confession is voluntarily made is a preliminary one for the determination of the trial court. Unless it can be said as a matter of law that the decision was wrong, it must stand. *State* v. *Long*, 95 Vt 485, 490, 115 A 734, and cases cited; *State* v. *Watson*, 114 Vt 543, 548, 49 A2d 174, and cases cited.

On this preliminary question the state improved as a witness Sheriff Moore of Windsor county. Previous to this and in the regular course of the trial, the Chief of Police of Spring-

field had testified for the state. He identified a coat, flashlight, tobacco can, lighter, comb and pencil as articles that he took from the respondent in the police station. Mr. Weatherup had previously testified and identified these articles as belonging to him and missing from his home after the night he was assaulted, the coat from the bedroom closet and the other articles from the sideboard in the dining room. On cross-examination the chief was asked about some questioning of the respondent at the police station and said that the respondent when asked if he broke into the Weatherup home, said that he had; that the respondent was just answering the questions, most of the time very promptly and directly and that he did not observe anything unusual in his manner. This questioning was previous to that appearing in the confession.

It appeared from the testimony of Sheriff Moore that the respondent, after his apprehension, was taken to the police station by the sheriff in his car; that after arriving there, he was given some coffee and doughnuts being served to others there and also given a cigarette; that after some general conversation and questions by the Commissioner of Public Safety in the presence of the State's Attorney, the respondent was asked if he was prepared to tell what had happened; that he was cooperative and gave an account of the events of the night of August 1 and early morning of the 2d. The sheriff further testified that there were no threats or coercion used; that no promises were made as to what would or would not be done in case he talked; that the respondent was informed that he was entitled to counsel if he wanted one; that he said he didn't need one, he didn't see what good it was going to do him. After he had related his version of what had happened, he was asked if he was prepared to give a formal statement in writing, have it taken down and he was informed if it was that it could be used against him; that he made no objection to making the statement; that no promises of protection were made him if he made it and that nobody threatened him if he didn't make it. In fact the confession itself contains in a general way facts showing it to be voluntary.

A stenographer, who was a policewoman, was then sent for and the formal statement or confession taken down in short-

hand. It was then typed and brought back for the respondent to sign. The respondent read it out loud, made six corrections in it by striking out words, inserting others in their place and initialing the correction; he then initialed and dated all five pages, added a paragraph at the end of the last page in his own handwriting and signed the last page. It developed in the course of the cross-examination of the sheriff that after the respondent had agreed to give the formal statement and while they were waiting for the stenographer, the sheriff had left the room for 5 to 10 minutes. He returned before it was taken and was there during its taking and continuously thereafter until it was signed.

When the confession was offered in evidence, the respondent objected. The objection was,

> "On the strength of the testimony of this witness that he was absent for a period of time before this statement was taken, that Blair was left in the presence of other officers and on the further grounds of his testimony that Blair had been without food for at least four days and was given food before any statement was taken, I object to the admission of State's 59 on the grounds that the statement could not have been taken voluntarily and without favor. It is our understanding that a confession shall be taken without any promises, threats or favors."

The court excluded it at that time on the ground of the failure of the state to account for all of the respondent's time before it was made.

The state then called the deputy chief of the Springfield police department as a witness. He testified that he was present in the room at all times with the respondent from the time he was first brought to the police station. His attention was called directly to the time between the first questioning of the respondent and the arrival of the stenographer which included the 5 to 10 minutes that the sheriff was absent from the room. He testified that he sat 6 to 8 feet from the respondent; that he could have heard any person talking to him;

that he heard no person make him any promises, raise his voice to him or threaten him. The respondent calls to our attention that the witness on cross-examination said that he was having conversation with other people in the room and that he might possibly have been talking to someone else while someone was talking to the respondent. This does not substantiate what the respondent claims for it. An examination of the transcript shows that this cross-examination pertained generally to all of the time the respondent was in the police station and not specifically to the time Sheriff Moore was out of the room. The respondent, before the stenographer was sent for, had already said that he was willing to have the statement taken down and typewritten. There was positive testimony that up to that time there had been no threats, cooercion or promises and he had been fully informed of his rights. It is most unlikely, and also highly improbable, that during that interval of 5 to 10 minutes that any threat, promise or inducement would or could have been made or offered for the purpose of inducing the respondent, or which did induce him, to do what he had already agreed to do. If such were the fact, it was peculiarly within the power of the accused to make it known.

 When inquired of by the court, the respondent offered no evidence in regard to the taking of the confession or how it was procured. The court thereupon admitted it and allowed the respondent an exception. The ground of the objection that the respondent had been without food for at least four days and was given food before any statement was taken is not briefed so it is waived. *Cook* v. *Holden*, 113 Vt 409, 411, 35 A2d 353. However, a distinction is made between direct and collateral benefits offered to obtain a confession. If a confession is made under the influence of some collateral benefit or boon, no hope being held out or fear excited in respect to the particular charge, it is voluntary. A promise of a collateral benefit, within the meaning of this rule, includes a promise by an officer who has the custody of the accused to permit him to obtain refreshments. 20 Am Jur Evidence, §510. See *State* v. *Tatro*, 50 Vt 483, 490.

■ The court by admitting the confession after hearing evidence of the circumstances attending the giving of it, impliedly held that it was voluntarily given. *State* v. *Watson*, 114 Vt 543, 549, 49 A2d 174. We cannot say as a matter of law that the decision of the trial court on this preliminary question was wrong. See the authorities heretofore cited to this proposition. This exception is not sustained.

Two days after the foregoing confession was obtained, the respondent was interviewed again at the state's prison. A statement was obtained from him at that time and written out in narrative form by the sheriff and it was then signed by the respondent. It was received in evidence without objection. The respondent claims that this second statement was but supplemental to the first confession and so tied in with it that if there was error in admitting the first, the latter was inadmissible too and his objection to the first applies to the second. The state claims that the second was separate and distinct from the first and an independent confession and if there was error in the admission of the first it was cured by the admission of the second without objection. In view of our holding that the first was properly admitted we give these questions no consideration.

Dr. Thorne, a physician and psychiatrist, was an expert witness for the respondent in regard to insanity. He testified in regard to his examination of the respondent at various times at the state's prison in November and December and the methods employed during such examinations for the purpose of enabling the doctor to form an opinion as to the respondent's mental condition or sanity. He asked for and received a case history of the respondent written by him. It contained his life history, and an account of his actions and Demag's in escaping from prison and the interval between then and their apprehension, including the episode at the Weatherup home. It was received in evidence as a part of that which was used by the doctor in arriving at his opinion of the respondent's mental condition but not as evidence of the facts stated in it. The doctor testified to observing the respondent during the trial which began on March 17. The doctor started his testimony on March 23. He testified that on March 18,

19 and 20 he submitted certain written questions to the respondent for him to answer in writing which he had done and that during his former talks with the respondent he had asked him the same or similar questions. The written questions and answers were then received in evidence on the same basis as the case history and not as evidence of the facts stated in the answers. Some of the written questions and answers were then read to the jury by the doctor and he stated that his purpose for the written questions and answers was to obtain a record in the respondent's own handwriting of the exact way in which he expressed his thoughts so that the jury could see first hand what he himself said.

The doctor was then asked this question, "And was there anything in the case history, or autobiography of Francis Blair which was of the same nature as he stated in the spontaneous answers to the questions?" The court of its own volition excluded the question on the ground, "There is no evidence these were spontaneous." Counsel then stated, "I assume, your Honor, if he [the doctor] wrote it out and Blair wrote it out, it would be somewhat spontaneous." An exception was allowed.

"Spontaneous" is defined as "Proceeding from natural feeling, temperament or disposition or from a native internal proneness, readiness or tendency without constraint. Proceeding from or acting by internal impulse, energy or natural law, without external force, self acting as spontaneous reaction." Webster's New International Dictionary. Again as "arising from inherent qualities or tendencies without external cause, especially without constraint or coercion, done or acting from impulse or desire, not having material causation outside of itself, self-generated." Funk & Wagnalls New Standard Dictionary.

■■ Spontaneous utterances, exclamations or answers to questions are generally considered in connection with their admissibility as evidence of the fact to be proved because they form a part of the "res gestae". For illustrative cases, see 39 A Words & Phrases, 528-530. "Res Gestae" comprehends a situation which presents a startling or unusual occurrence

sufficient to produce a spontaneous and instinctive reaction, during which interval certain statements are made under such circumstances as to show lack of forethought or deliberate design in the formulation of their context. The term "res gestae" implies that the events themselves speak through the instinctive words and acts of the participants and that the facts and declarations which grow out of the main fact are contemporaneous with it and serve to illustrate its character. Expressed differently, whether a declaration is a part of the "res gestae" depends upon whether the declaration was the facts talking through the party or the party talking about the facts. 20 Am Jur, Evidence, §662.

We quote a few of the written questions asked the respondent by the doctor: "Are there any people who you think are against you? Please write down their names and tell why you think they are against you. Do you think there is any difference between you and other men in that they should obey the laws while you feel that you are a law unto yourself? Is there anybody else you would kill if you got a chance? Have you ever thought of killing people in the past? How strong do you feel these ideas about wanting to kill people? Have you often had ideas of wanting to kill people? Do you think there is anything the matter with your mind, and if so what?" Simply quoting these questions without even quoting the answers shows plainly that any answers to them could not have been spontaneous within the res gestae rule or within the dictionary definitions of the word. The answers could well have been a pure narrative of the respondent, suggested by the questions, not arising from inherent qualities or tendencies of his mind without external cause, not proceeding from natural feeling, temperament or disposition and not self-generated.

The respondent relies upon the case of *Beausoliel* v. *United States*, 71 App D C 111, 107 F2d 292. That was a prosecution for an assault by a taxicab driver on a six year old child. The mother met the child in a store a few minutes after she left the taxi and noticing a peculiar expression on her face questioned her. The statements made to the mother were held admissible as spontaneous utterances. The facts in that

case are so different from those in the instant case that it is not in point.

He also relies upon the case of *King* v. *State*, 155 Ga 707, 118 SE 368, wherein it is said, in discussing the admissibility of a purported confession, obtained from a young man after three hours of grilling by the officers including other circumstances not necessary to mention that, "The word 'voluntarily' is practically synonomous with 'spontaneously' of his own free will, and not when overmastered by the will of another." The quoted statement must be read in the light of the rest of the opinion and the facts and circumstances discussed by the court. It is not in point here. That is well illustrated by the instant case. The confession here, as we have seen, was voluntary, but it cannot be said to be spontaneous at the time it was given in the presence of the stenographer, later transcribed, then read, corrected and signed by the respondent.

■ Under the rule that a confession must be "voluntary" to be admissible, "voluntary" does not mean "spontaneous" but merely requires that the accused act on his own judgment, uninfluenced by methods and devices employed by the officers which are denounced by the law. *State* v. *Gibilterra*, 342 Mo 577, 116 SW2d 88. The term "voluntary" as applied to confessions does not, therefore, mean "spontaneous." 20 Am Jur, Evidence §497, p 430.

■ The respondent in his reply brief claims, at least by inference, that the court went beyond that which was proper by excluding the question of its own volition on direct-examination of the witness. The order or manner of conducting the examination of witnesses is so far a matter of discretion with the trial court that it will be reviewed only for an abuse of discretion. *Woodhouse* v. *Woodhouse*, 99 Vt 91, 118, 130 A 758. The recognized test for an abuse of discretion is whether the court exercised it on grounds or for reasons clearly untenable or to an extent clearly unreasonable. Any discretionary ruling is not subject to review unless it clearly and affirmatively appears that such discretion has been abused or withheld. The scope of our inquiry is limited to claimed legal errors and

we are bound to indulge every reasonable presumption in support of the trial court. *Ricci* v. *Bove's Executor*, 116 Vt 335, 339, 75 A2d 682, and cases cited.

■ The question was also faulty in addition to the reason stated by the court and it would have been proper to exclude it on other grounds. It contained the conclusion of the interrogator that the answers were spontaneous. A question containing a conclusion of the interrogator is improper. 70 CJ, Witnesses §704, p 545. Also the witness had been fully interrogated as to the questioning of the respondent by him. The questions and answers had been read to the jury. His case history was an exhibit in the case and the jury could have formed an intelligent conclusion from them as to whether there was anything in the case history of the same nature as was stated in the answers. *State* v. *Averill*, 85 Vt 115, 123, 81 A 461.

Applying the foregoing tests and principles, we cannot say that it has been shown that the trial court abused its discretion in excluding the question of its own volition. The exception is not sustained.

Dr. Forest, a psychiatrist and senior physician at the Vermont state hospital and also visiting psychiatrist at the state's prison since 1944, was a witness for the state. He testified that he first examined the respondent at the prison in 1951 and again on August 14, 1952. It appeared that the respondent was indicted on August 21 for murder in the first degree and that he was arraigned on August 27th, pleaded not guilty and not guilty by reason of insanity and that on September 2 by order of the court he was committed to the Vermont state hospital under V. S. 47, §2460 for observation.

■ Dr. Forest testified in regard to his examination of the respondent until and including Sept. 11 the day he was, under court order, returned to the state's prison. He further testified in regard to examining the respondent at the prison on various occasions after he was returned there. He gave his opinion as to the respondent's mental condition and sanity which we shall refer to later. He was very fully interrogated on cross and redirect examination about respondents who had

been committed to the state hospital for observation as to their sanity and about their being returned to court and having to stand trial. Near the close of the re-cross examination he was asked the following question, "But doctor, in giving these opinions, you have, if a man has been declared,—for example a respondent sent to the hospital for observation, if you as a state psychiatrist did report to the court that this man was insane, he didn't have to stand trial, did he?" On objection the question was excluded and the respondent allowed an exception. The question was improper because it called for the conclusion of the witness on a proposition of law. 58 Am Jur, Witnesses, §565, p 316. The respondent admits that the extent of cross-examination rests in the sound discretion of the trial court but claims that such discretion was abused here. An examination of the record does not convince us there was any abuse of discretion. *State* v. *Schoolcraft*, 110 Vt 393, 395-396, 8 A2d 682.

Dr. Chittick, Superintendent of the Vermont state hospital since 1944, a physician and psychiatrist, was a witness for the state. He testified that he first saw and interviewed the respondent on September 2, the day he was admitted to the hospital for observation; that he saw or interviewed him nearly every day from that date until September 11, the day he was taken back to prison. He testified fully about his interviews including conversations from notes he made at the time and also said that when he saw the respondent and did not interview him, it was generally done so he could observe him and his conduct without it being known to the respondent. He testified that at the time of the interview on September 2, from some things the respondent said and his conduct, the doctor was of the impression that he was malingering; that the respondent on September 5, after a long interview and as the doctor was leaving said, "I am sorry I tried to give you the run around the other day."

A man who worked at the hospital and who was assigned for special duty to take care of the respondent was called as a witness and testified that he was present during the interview that the doctor had with the respondent on September 2 and that after the doctor departed at the end of that interview,

the respondent told the witness that he had been giving the doctor a run around but "that fellow is plenty smart, you can't fool him" and that the witness put that in the report he was keeping.

The doctor further testified that physical examinations of the respondent at the hospital including an electroencephalogram and x-ray studies were entirely normal; that except for some things in connection with the interview on September 2 there was nothing abnormal at all about the respondent while he was at the hospital and nothing that indicated mental illness. He further testified that he had long interviews with the respondent at the prison on October 2, November 25, December 31 and March 12 and that Dr. Forest was present on the latter date. He told the jury in detail from his notes what was said on each of those occasions. He testified that he had read the two confessions and heard the case history of the respondent, also Dr. Thorne's testimony in court including the written questions and answers and gave his opinion that the respondent as he sat there in court was sane and not mentally ill; that the respondent had a severe form of psychopathic personality with no psychosis. He then explained why in his opinion there was no psychosis. He then testified that in his opinion the respondent was not suffering from any mental illness, psychosis or insanity at any time when he had seen or examined him or on August 1 and 2, 1952; that he could not have had on those dates such a perverted and deranged condition of his mental and moral faculties as to render him incapable of distinguishing between right and wrong or so that he was not conscious of any act that he might commit on those dates and that on those dates he could not have had an uncontrollable impulse resulting from any mental disorder. He further testified that the symptoms the respondent started relating to him at the prison on November 25, December 31 and March 12 and in the written answers to the questions of Dr. Thorne were pure malingering, that is, that the respondent was faking, telling stories and had no such ideas as he expressed. He then explained fully why he arrived at that opinion and the basis for it.

On cross-examination the doctor was asked this question,

"Doctor, in your opinion, is an episode of emotional excitement a cause of an irresistible impulse?" It was excluded on the ground that it was not confined to irresistible impulse as defined by the courts and was not pertinent to the case. An exception was allowed the respondent.

██ ██ The extent and scope of cross-examination rests largely in the sound discretion of the trial court and its ruling thereon is not revisable in the absence of an abuse thereof. *State* v. *Aronson*, 111 Vt 129, 130, 11 A2d 214, and cases cited. The excluded question was general in its nature. It applied to any episode of emotional excitement as the cause of an irresistible impulse. Such an impulse on the ground of insanity was the defense here. The law is that if a respondent is conscious of the nature of his act and able to distinguish right from wrong, yet if his mind or will is involuntarily and completely destroyed so that he cannot control his actions, that is, if his mind or will is governed by an uncontrollable and irresistible impulse produced and growing out of mental disease and he is unable to resist the impulse to do the act complained of, then he is in a legal sense insane. *State* v. *Stacey*, 104 Vt 379, 410, 160 A 257, 747; *State* v. *Kelley*, 74 Vt 278, 286-287, 52 A 434 *Rogers* v. *State*, 77 Vt 454, 487, 61 A 489; *Doherty* v. *State*, 73 Vt 380, 383, 50 A 1113. The irresistible impulse must be one produced and growing out of mental disease and not from an episode of emotional excitement.

██ The right of cross-examination is not to be impaired in any of its respects. But its extent is within the discretionary control of the trial court provided the right itself is not infringed. The pursuit of a witness into the realm of collateral matters must of necessity end somewhere—or litigation would not. The trial court's discretion must fix that limit, although the exercise of that function be attended with some difficulties. *State* v. *Teitle*, 117 Vt 190, 196, 90 A2d 562.

Here the cross-examination of Dr. Chittick takes up 47 pages of the transcript. It started in the latter part of the forenoon and did not end until well into the first part of the next forenoon. The question excluded was asked at nearly the end of that examination. The doctor had been ably and

vigorously cross-examined. It had covered his examination and questioning of the respondent, his consideration of the respondent's background and life history, the respondent's motivations and what he might do under stress, his psychopathic personality and ability to control himself, the emotional stress of the respondent at the time he broke into the Weatherup home when he was hungry and being hunted because he had escaped from prison and also that his history showed that he was quite impulsive. An examination of the record shows that the trial court over objections of the state allowed counsel for the respondent great latitude in the cross-examination of the doctor. There has been no abuse of discretion shown in excluding the question.

■ The respondent made a motion to set aside the verdict on various grounds. It was denied generally by the trial court as far as is disclosed by the record and an exception allowed. The first ground relied on here is: "That the jury failed to follow the instructions of the court relative to the state's position of having the burden of proving the respondent sane beyond a reasonable doubt." This presented a question of law and the decision thereon is reviewable here. *Mullett* v. *Milkey*, 113 Vt 42, 44, 29 A2d 806, and cases cited. The respondent in his brief in support of the motion lifts from the court charge to the jury one sentence having to do with the degree of insanity being sufficient to control the will of the subject and to have taken from him the freedom of moral action. All he says in his brief is that if the jury had followed this portion of the charge they would have had to find that the state had failed to prove the respondent sane beyond a reasonable doubt, as Dr. Chittick had testified that he could not explain why a person failed to utilize his will power when a victim of an impulse. This is improper briefing. Supreme Court Rule 8 [3]. We have given it careful examination, however.

■ The question referred to that the doctor answered was a general one. It had no particular significance in connection with the conduct of the respondent or the condition of his mind at the time of the episode in the Weatherup house. A charge is not to be construed piecemeal but as a whole. *Lancour*

v. *Herald* & *Globe Association,* 111 Vt 371, 382, 17 A2d 253, 132 ALR 486, and cases cited. The charge was unexcepted to and we have examined it. We find that it contains a full, complete and accurate statement of the law on insanity with particular reference to irresistible impulse as we have heretofore stated it in this opinion. It also clearly and accurately explained the meaning of reasonable doubt and the burden of the state in connection therewith.

In addition to what we have summarized from the testimony of Dr. Chittick, we find that Dr. Forest testified, in addition to what we have already mentioned, that the respondent had a psychopathic personality without psychosis and was not insane at any time when he examined him or on August 1 and 2; that he was of the opinion the respondent was malingering when he examined him at the prison in November and at subsequent times; that he was not suffering from any mental disease or illness at any time when he examined him or on August 1 and 2 and was not psychotic; that on the latter dates there was no mental or moral disturbance of the respondent's faculties that would render him incapable of distinguishing right from wrong or of such a nature so that he would not be conscious of the nature of his acts and that he could not have had an irresistible impulse resulting from mental disease.

There was a definite conflict between the experts for the state and those for the respondent in regard to the mental condition of the respondent. Dr. Thorne testified that on August 1 and 2 the mental disorder or disease with which the respondent was afflicted was psychopathic personality with psychosis and that on those dates he was legally insane and his mind was so deranged from a mental disorder as to make it impossible for him to control his irresistible impulses. On cross-examination, however, he testified, that the respondent knew right from wrong after he broke out of prison and while he was staying in the woods and keeping away from the officers; that he knew it was wrong to enter the Weatherup house in the nighttime by force; that after watching the Weatherup home from a hiding place in the woods from 3 or 4 o'clock in the afternoon until he saw that the people in it had gone to bed

and then entering by force to obtain food or a car, he was not the victim of an irresistible impulse until after Mr. Weatherup appeared on the scene and that the respondent then lost control of himself.

We summarize the testimony of Dr. Ripley, another psychiatrist, who was a witness for the respondent. He said that he examined the respondent on December 22 at the prison; that the respondent knew right from wrong at that time; that he had heard his case history and the testimony of Dr. Thorne and had seen the respondent during the trial. He testified that in his opinion the respondent was a dementia praecox, paranoid type when he examined him on December 22. When asked his opinion of the respondent's mental condition on August 1 and 2, he said that he did not see him on those dates, but the type of case would indicate that there would not be much change between that time and the time he had examined him and that in his opinion he would be the victim of an irresistible impulse.

It was for the jury to evaluate the foregoing testimony together with any and all other evidence in the case bearing upon the sanity or insanity of the respondent aided by proper instructions from the court, which we have seen were given. It has not been shown that the jury failed to follow the instructions of the court in finding that the state had proved the respondent sane beyond a reasonable doubt.

It should be mentioned that the court said in its charge that counsel were correct in stating to the jury that under the facts there were only two possible verdicts: [1] Guilty of murder in the first degree; and [2] Not guilty by reason of insanity. The undisputed evidence showed that the homicide was committed in perpetrating burglary. V. S. 47, §8240.

 The only other ground of the motion relied on here is that, "The verdict must have resulted from an utter disregard of all the evidence pertaining to the question of sanity or insanity of the respondent." This is of the same general class as that the verdict resulted from passion, bias or prejudice or is against the weight of the evidence, against the evidence or contrary to the evidence and was therefore,

addressed to the discretion of the trial court. *Rule* v. *Johnson*, 104 Vt 486, 490, 162 A 383, and cases cited; *Russell* v. *Pilger*, 113 Vt 537, 550, 37 A2d 403. In the disposition of a discretionary ground of a motion to set aside a verdict, it is the duty of the trial court to consider the evidence in the light most favorable to the verdict. *Woodhouse* v. *Woodhouse*, 99 Vt 91, 155, 130 A 758; *Russell* v. *Pilger*, *supra*, 113 Vt at p 551, 37 A2d 403.

The respondent says in his brief that the state psychiatrists admitted they did not have certain vital information of the respondent's background at the time they reached their opinions as to his sanity and that the respondent's psychiatrists established that a complete and thorough psychiatric examination was made of the respondent and that they also used all essential material regarding his background in reaching their opinion. There was no motion to strike any of the testimony so the ground now raised only goes to the weight of the testimony. The question is inadequately briefed, no transcript pages are given or authorities cited. Supreme Court Rule 8 [3]. The respondent devotes about one-half page of his main brief to this phase of his motion and does not mention the motion in his reply brief. We have examined the transcript, which we are not required to do and have given the matter careful consideration.

The transcript shows that when the attention of the psychiatrists for the state was called to certain information about the respondent's background that had not been available to them when they formed their opinions as to his sanity, they testified that such information would not change their opinions. It also shows that the psychiatrists for the respondent testified that they gave no consideration to certain information in regard to the respondent in forming their opinions. The extent of the examination of the respondent by each psychiatrist and the information about him that they had and used was fully testified to by each of them. All of the foregoing went to the weight of their testimony. There was evidence in the case pointing to the sanity of the respondent and it was for the jury to say, as the sole judges of the

weight of all the evidence, whether this evidence was sufficient to outweigh beyond a reasonable doubt the evidence pointing to his insanity. *State* v. *Wilson*, 113 Vt 524, 529, 37 A2d 400.

The exercise of discretion in passing on the weight of the evidence is for the trial court alone as we have no discretionary power in the matter. In this court the only question for review on a discretionary ruling is whether the trial court has abused its discretion. *Russell* v. *Pilger, supra*, 113 Vt at p. 552, 37 A2d 403, and cases cited; *Gould* v. *Towslee*, 117 Vt 452, 467, 94 A2d 416. With the evidence in the record to which we have referred, we cannot say that the court abused its discretion in refusing to set aside the verdict on the ground stated in the motion. *Macauley* v. *Hyde*, 114 Vt 198, 206, 42 A2d 482; *Ricci* v. *Bove's Executor, supra*, 116 Vt at p. 339, 75 A2d 682.

The record in this case has been carefully examined, and all questions raised have been considered. No reason appears for disturbing the result reached in the trial court.

*Judgment that there is no error, and that the respondent takes nothing by his exceptions. Let sentence pass and execution be done.*