## State of Vermont v. Daniel William Bruley

[274 A.2d 467]

No. 35-70

Present: Holden, C.J., Barney, Smith and Keyser, JJ., and Hill, Supr. J.

Opinion Filed December 29, 1970

*James L. Levy*, City Grand Juror, St. Albans City, for Plaintiff.

*Howard R. Goldberg*, Burlington, for Defendant.

**Holden, C.J.** During the evening of December 20, 1969, Keith Campbell parked his 1968 Ford station wagon in the driveway of a garage which he rented in St. Albans, Vermont. The vehicle was registered in the names of Campbell and his wife Doreen. Sometime during the night the automobile was taken from its parking area without Campbell's consent.

Early the next morning Bertrand Sheltra was operating a tractor-tanker unit, traveling south on Interstate 89, between St. Albans and Burlington, when he came upon and passed the Ford station wagon. Its operator then brought the vehicle so close to the rear of the trailer that it hit the rear wheels of the tanker. The station wagon went out of control, crossed the median and went into the guardrail along the opposite or northbound lanes of travel. Sheltra halted the tanker to investigate and offered assistance to the operator of the station wagon.

The operator said he wasn't hurt, that he was going to leave the station wagon at the site and asked for a return ride to St. Albans. Shortly thereafter Clifton Japhet, traveling north in the direction of St. Albans, came upon the scene of the accident. He assisted in getting the car out of the guardrail and gave the operator a ride to St. Albans.

The respondent Daniel William Bruley was subsequently prosecuted and convicted in a trial by jury for the offense of taking and operating the Campbell station wagon, without the consent of its owner, in violation of 23 V.S.A. § 1091. He brings this appeal from the judgment which followed.

By way of an exception to the denial of his motion for a directed verdict of acquittal, the respondent contends the State failed to establish the *corpus delicti* of the offense charged. The claim is based on absence of proof that the subject motor vehicle was taken without the consent of Doreen Campbell, one of the registered licensees.

We find no shortage of proof in the State's case on this point. The witness Keith Campbell testified that he owned the vehicle and the evidence bears out that it was in his constructive possession until it was wrongfully removed from the garage area where he had parked it for the night. And even if it can be said, on the strength of the registration, that the property was jointly owned by Mrs. Campbell, that fact would not aid him.

The gist of the offense is the wrongful taking and the unauthorized operation of the vehicle. Although penal statutes are closely construed, the term "owner" is not restrictive to one who holds the record, or legal title. *Guild* v. *Prentis*, 83 Vt. 212, 215, 74 A. 1115 (1910) ; *Payne* v. *Sheets*, 75 Vt. 335, 348, 55 A. 656 (1903). As with civil conversion, actual possession of personal property is enough, *prima facie*, to sustain the charge. *Paska* v. *Saunders*, 103 Vt. 204, 217, 153 A. 451 (1931). Since Mr. Campbell's ownership and custody was established beyond dispute, the violation of the statute was complete when it was shown that the property was taken from his possession and operated without his consent, as alleged in the information. See *State* v. *Shoemaker*, 96 Ohio St. 570, 117 N.E. 958, 959 (1917).

The respondent requested the trial court to order the witnesses sequestered. This request was granted. Defense counsel also asked the court to make "some arrangement" for an in-court lineup. The procedure suggested by the defense called for the accused to line up with two or three male jurors and to require any identification of the respondent at the trial to be made from that group. Upon the State's objection, the motion was denied. Whereupon counsel stated to the court:

". . . I would assume that the Court at least would have no objection to the respondent not being seated at the table with his attorney at the time that such witnesses testify as may be those who would be offered for the

purpose of identifying the respondent as the person who perpetrated the crime alleged.

"THE COURT: If this point in the trial is reached, I don't understand, Mr. Brown, that the Court could control where you sit. If you choose to leave the respondent at that time, it is all right with the Court."

Clifton Japhet was called as a witness for the prosecution. After stating his observation of what occurred on Interstate 89 in the early morning of December 21st, the prosecutor inquired:

"Q Do you, looking around the courtroom, do you see the gentleman to whom you gave this ride?

A I think so.

Q You think so—do you know so?

A No.

Q Who do you think was the man to whom you gave a ride?

A I think the man with the mustache but I am not sure.

Q Did you at some time earlier make an identification?

A I pointed to a photograph at the police station.

Q How many photographs were submitted to you?

A Approximately 16, and I picked one as my first choice and another as my second choice.

Q At the time were you positive of the identification?

A No, I was relatively sure but not positive, to be very honest.

Q Could you describe the vehicle you came across on the Interstate?

A Yes, a Ford station wagon—late model."

During cross-examination the witness' attention was called to the jurors and asked if it would be possible that "some one of these people could have been the man you gave the ride home?"

"A I didn't acquaint myself with the surroundings when I first came in. When I did try to get my thoughts together, the prosecuting attorney asked me if there was anyone in the courtroom and I just automatically looked around the room.

Q You can't say with surety whether or not you see the man here to whom you gave a ride home?

A The mustache confused me."

Bertrand Sheltra was also called by the State. Counsel for the State inquired:

"Q Looking around the courtroom, do you notice the driver of this vehicle?

A I believe that guy sitting over there (indicating the respondent).

Q Are you sure?

A Yes.

Q Positive?

A Yes.

Q You are positive it was this gentleman here (indicating the respondent)?

A Yes.

Q How close were you to the driver of this vehicle—physically how close?

A I was within a foot of him at one time.

Q Within a foot of him. Did you have occasion to look carefully at his features?

A Yes."

On cross-examination he was asked if he had seen the respondent before arriving in the courtroom. He answered in the negative. Counsel for the defendant continued:

"Q Did you have any idea where he would be seated?

A No—none whatsoever.

Q You did see, however, that he was seated next to me?

A Yuh.

Q You knew I was attorney for the respondent here?

A Right.

Q It would be a perfectly simple matter to deduce then that the person you were being requested to identify would be the one seated at the table with me?

A No, you could have somebody else sitting there, couldn't you?

Q I think you make a very good point, Mr. Sheltra."

Such is the substance of the State's case. The facts are not disputed since the defense rested without presenting any evidence.

The respondent contends that the identification procedure adopted by the court was suggestive to the point of depriving him of a fair trial and the protective rights of due process. His argument places much reliance on *United States* v. *Wade,* 388 U.S. 218, 18 L.Ed.2d 1149 (1967) and *Stovall* v. *Denno,* 388 U.S. 293, 18 L.Ed.2d 1199 (1967).

In the *Wade* case, the defendant's conviction in the federal district court was reversed because a pretrial lineup identification was conducted in violation of the defendant's right to the assistance of counsel protected by the Sixth Amendment of the United States Constitution. But the Court went on to hold that such primary illegality did not rule out the in-court identification *per se.* The cause was remanded to the trial court to determine whether the in-court identification "had an independent source, or whether, in any event, the introduction of the evidence was harmless error." *United States* v. *Wade, supra,* 18 L.Ed.2d at 1164, 1166. See also *Gilbert* v. *California,* 388 U.S. 263, 18 L.Ed.2d 1178, 1186 (1967).

In *Stovall* the Supreme Court observed that ". . . the practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . . ." In that instance the Court was concerned with a hospital confrontation of the accused by one of his victims in an emergency situation. Refusing to apply the doctrine of *Wade,* retroactively the dismissal of his federal *habeas corpus* petition was affirmed, with four justices concurring in the view that there was no violation of due process. *Stovall* v. *Denno, supra,* 18 L.Ed.2d at 1207.

In the case at hand, no claim is made that any legal impropriety attended the pretrial photographic identification of the respondent in the investigatory stage. In any event, the record yields up nothing to indicate the identification was incorrect. And there is no suggestion that considerations of due process have been offended. *Coleman* v. *Alabama,* 399 U.S. 1, 26 L.Ed.2d 387, 90 S.Ct. 1999, 2000 (1970); *Simmons*

v. *United States,* 390 U.S. 377, 19 L.Ed.2d 1247, 1252–254 (1968).

■ The respondent was identified in court in the presence of his able and experienced counsel. Other than the customary courtroom setting, there was nothing to suggest the identification made by the witnesses Japhet and Sheltra. While the former's testimony was unsure, the identification by Sheltra was certain. It remained steadfast in its bearing on the accidental meeting on Interstate 89 as the independent source of the identification made at the trial. And there is nothing in the record to countervail the identity thus fixed.

In the light of the circumstances presented, we hold that the identification procedure used at the trial did not deny the respondent due process of law. *Simmons* v. *United States, supra,* 19 L.Ed.2d at 1254. The respondent was justly convicted and the judgment must be affirmed.

■ The remaining questions concern the sentence and the trial court's stay of its execution during the pendency of this appeal. The court imposed a sentence of ". . . not more or less than nine months in the House of Correction." A *mittimus* issued accordingly. The court was without authority to impose a sentence with the same maximum and minimum terms of confinement. 13 V.S.A. § 7031; *In re Parent,* 125 Vt. 475, 218 A.2d 717 (1965).

It should be noted, however, that when the *Parent* case was decided it was mandatory for the sentencing court to impose both a maximum and a minimum term. By virtue of an enactment of the 1969 General Assembly at its adjourned session, the sentencing court "shall establish a maximum and may establish a minimum term for which such respondent may be held in any state correctional institution." 1969, No. 182 (Adj. Sess.), § 1. Thus the court in imposing sentence could fix a maximum term and also specify a shorter minimum. In the alternative, it could establish the maximum time for confinement without reference to a lesser time. But, as we have seen, insofar as the order sought to sentence the respondent to a term of not less than nine months, it was without force and effect. *In re Parent, supra,* 125 Vt. at 475.

█ . Apparently the respondent was unable to obtain bail in the required amount during the pendency of his appeal. He requested the court to put his sentence into execution, that he might commence serving his sentence and receive credit for time spent in confinement while awaiting appellate disposition of his conviction. Over the respondent's objection, the district court ordered execution of the sentence stayed under the provision of 12 V.S.A. § 2388. This section provides:

> In criminal causes where the respondent has been convicted of a misdemeanor or of a felony which may subject him to capital punishment, judgment, sentence and execution shall be stayed pending the expiration of the period allowed for filing a notice of appeal. Upon timely filing of such notice, judgment, sentence and execution shall be stayed pending determination of the appeal. In other criminal causes, judgment, sentence and execution shall be stayed only at the discretion of the court and upon order made.

To the same effect is the mandate of 13 V.S.A. § 7401. These provisions were designed to guarantee to the respondent seeking to appeal a conviction in misdemeanor and capital causes, that he will not be called upon to pay the penalty of his sentence until the time for entering an appeal has expired or the appeal heard. State v. Snyder, 123 Vt. 178, 179, 184 A.2d 546 (1962).

█ Clearly the requirement of a mandatory stay in criminal appeals from convictions for minor offenses was intended to protect the appellant. Since the stay worked to the respondent's detriment for want of bail, he was entitled to waive the statutory provision by a competent waiver. State v. Dehler, 257 Minn. 549, 89 A.L.R.2d 496, 503 (1960); 21 Am.Jur.2d Criminal Law § 218, 28 Am.Jur.2d Estoppel and Waiver §§ 164 and 167. In this instance, clearly there is no valid public interest to withhold execution of sentence while the respondent awaits in confinement a review of errors claimed at the trial. Such procedure might well produce an imprisonment that would exceed the maximum penalty specified in the statute for the offense charged.

Although the conviction is affirmed, the inspection of the record, as provided in 13 V.S.A. § 7402, indicates that

judgment should not have been respited on March 23, 1970. The respondent should have been committed in execution of his sentence in accordance with his request.

*Judgment affirmed. The respondent having served the maximum sentence of nine months, imposed by the district court, it is ordered that he be released from confinement.*