## State of Vermont v. William Mayer

[283 A.2d 863]

No. 50-70

Present: **Holden, C.J., Shangraw, Barney, Smith and Keyser, JJ.**

Opinion Filed October 5, 1971

*Patrick J. Leahy,* State's Attorney, for the State.

*David W. Curtis,* Burlington, for Defendant.

**Holden, C.J.** The defendant has been tried by jury and convicted of the offense of armed robbery as specified in 13 V.S.A § 603. The crime was committed in Essex Junction, Vermont, at about five thirty in the early evening of December 7, 1969. The victim, an eighteen year old filling station attendant, named Rodney Bolio, was held at gunpoint as he returned to the cash register in the lighted station after selling gasoline to a motorist. Bolio was accosted by a man, about thirty years of age, who had black curly hair. He was wearing a blue turtleneck sweater, dark pants and sunglasses. The intruder was armed with a calibre .22 pistol that had a barrel about six inches long and a dull black finish. The weapon was loaded. Pointing the gun at the attendant, the assailant demanded all the cash the attendant had. Bolio delivered over some one hundred thirty dollars in cash. He was ordered to lie on the

floor and count to thirty as the offender fled. The telephone cord had been severed. Bolio made an immediate report to the state police from a neighboring telephone station and gave a description of the person who conducted the holdup.

The defendant was arrested on December 10, 1969, at a motel room in South Burlington which he and his girl friend, named Mary Paquette, were occupying. The arresting officers had warrants to arrest both the defendant and Mrs. Paquette. They had received prior information that the defendant was armed. When the defendant was arrested a .22 calibre, Harrington and Richardson, six inch barrel revolver was found and seized by the officers. The gun was later identified and received in evidence at the trial after the defendant's pretrial motion to suppress was denied. The defendant's first claim of error contends the weapon was the product of an illegal search and seizure and the failure of the trial court to exclude it from the State's case violated the protection guaranteed by the Fourth Amendment of the United States Constitution.

It appears from the testimony taken at the suppression hearing that when the arresting officers entered the motel room the defendant was standing between the bed and the door. Mrs. Paquette was sitting on the bed within reach of two pillows that were at the center of the bed. The defendant was also nearby, between three to four feet from the pillows. When one of the officers disturbed the bedclothes the twenty-two calibre loaded handgun was discovered under the pillows.

At the pretrial hearing the defendant testified his person had been searched for weapons and he was handcuffed at the time the gun was discovered. This was directly denied by the arresting officers. Except for this particular, the evidence is in accord concerning the circumstances of the discovery. Any conflict in the evidence presented at the preliminary hearing was resolved by the trial court in receiving the weapon against the exclusionary rule advanced by the defendant. Unless the undisputed facts demonstrate the ruling was in error as a matter of law, the trial court's decision must stand. *State* v. *Blair*, 118 Vt. 81, 85, 99 A.2d 677 (1953); *State* v. *Watson*, 114 Vt. 543, 548, 49 A.2d 174 (1946).

Relying entirely on *Chimel* v. *California*, 395 U.S. 752, 768, 89 S.Ct. 2034, 2043, 23 L.Ed.2d 685, 697 (1969), the defendant

maintains that the seizure of the gun without a warrant exceeds the limits of reasonable search and seizure incident to a lawful arrest. After Chimel was arrested, the police conducted a warrantless search of nearly an hour's duration throughout his entire home, covering bedrooms, attic, garage and workshop. The scope of the search "went far beyond the petitioner's person and the area from which he might have obtained either a weapon or something that could be used as evidence against him." The Supreme Court held that such a warrantless search was unreasonable under the Fourth and Fourteenth Amendments.

The opinion of the Court by Justice Stewart makes it entirely clear there is ample constitutional justification for enforcement officers to conduct a protective search for weapons at the time of a lawful arrest.

> "When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel* v. *California, supra,* 23 L.Ed.2d at 694.

Upon entering the motel room, in response to the command to arrest the defendant for armed robbery, it was an essential security function for the enforcement officers to search the accused and the area within his reach. It was equally reasonable that the protective search extend to the area within

reach of his female companion. It appears that the weapon was within the grasp of both. Until the weapon was secured, either occupant of the room had the capability of impeding the arrests and endangering the lives of those present. The search was reasonable in the point of time and place of arrest. The evidence it produced was properly received. *Peters* v. *New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917, 937 (1968). See also *Preston* v. *United States,* 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777, 780 (1964).

During the direct examination of James F. Mulcahy, the Chief of Police of Essex Junction, the state's attorney inquired about the defendant's response to the warnings given him by the officer concerning his constitutional rights as a person in custody. According to the witness, the defendant's reply included obscene language. Although the witness refrained from repeating the obscenities, the defendant contends that the fact they were spoken prejudiced the verdict to the extent fairness requires a new trial be ordered. The record does not bear out the claim.

The state's attorney inquired of the witness:

> "Leahy: Could you tell us, do you recall the exact words he used after you advised him of his rights? If counsel is going to object.
>
> Judge: This calls for a yes or no answer. Could you give the exact words?
>
> A. I could if requested, I would rather read them off.
>
> Leahy: I understand your hesitancy. Did he say he understood his rights?
>
> A. Yes, he did, sir.
>
> Q. Did he say this emphatically?
>
> A. Very much so.
>
> Q. And did he use obsenities (sic) in stating that?
>
> Curtis: The fact that Mr. Mayer may or may not have used obsenities (sic) is immaterial.
>
> Leahy: I withdraw the question.
>
> Judge: Very well."

■ No motion to strike the reference to obscenities was made and there was no request for a cautionary instruction to the jury. It appears that the episode generated no great concern at the time the testimony was given. Apparently the

defendant was content to permit the matter to rest ·with the withdrawal of the objectionable question. And we are not persuaded that the jury was in any way diverted or prejudiced by a question which was advanced and withdrawn by the State before the final answer was given. No harm was claimed when the inquiry was made. No prejudice appears on appeal. *Knight* v. *Willey*, 120 Vt. 256, 264, 138 A.2d 596 (1958) ; *Crossman* v. *Perkins*, 101 Vt. 94, 95, 141 A. 594 (1928). Compare *State* v. *Garceau*, 122 Vt. 303, 307, 170 A.2d 623 (1961).

The final error assigned by the defendant's counsel concerns the evidence given by the victim Bolio, which affirmatively identified the defendant as the person who robbed him at the filling station on the evening of December 7, 1969. The defendant does not indicate that the error, now claimed, was called to the attention of the trial court. And our reading of the record fails to disclose that an objection to this effect was voiced at the trial. See *State* v. *Hood*, 123 Vt. 273, 277, 187 A.2d 499 (1963). We have reviewed the record to determine whether prejudice is indicated which might offend the rights of the defendant within the doctrine of *United States* v. *Wade* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), as the defendant contends.

It developed on cross-examination of the witness that during the investigation of the offense he was shown eleven photographs of ten different subjects. Two of the pictures were of the defendant. The witness identified the two photographs of the accused as the subject who held him up.

It appears that the witness later observed the defendant during a visit to the courthouse about a month before trial. Bolio testified that no one pointed out the defendant to him and that he had no difficulty in recognizing the defendant as the holdup man.

This occasion was explored further on cross-examination. Defense counsel inquired:

"Q: Now, when you came to the court house who did you come to see?
A: The Chief.
Q: Chief Mulcahy?
A: Yes.
Q: Did he tell you what he was bringing you down for?
A: To go to court.

Q: To see whether or not you recognized the man that held you up?

Leahy: Objection.

Judge: Sustained as to the way the question was phrased.

Curtis: Did he tell you why you were coming down here?

A: Yes.

Q: What was the reason for your trip down hear (sic)?

A: To talk over the case.

Q: And were you going to look for and identify any one?

A: No.

Q: You just came down that one day to talk over the case?

A: Yes.

Q: And did Chief Mulcahy, where did you go?

A: Up on the third floor.

Q: You just went directly up to the third floor, did you stopp (sic) on the second floor at all?

A: Yes.

Q: Did you walk up to the third floor?

A: No, we took the elevator.

Q: You were not aware you were going to try to iden- tify that man?

A: No.

Q: Did you know Mr. Mayer was going to be here?

A: No.

Q: You had seen his picture, is that not correct?

A: Yes.

Q: And you recognized him once again?

A: Yes.

Q: How many times did you come by this floor, or door or lobby out there to see Mr. Mayer?

A: Twice.

Q. And I believe you testified that the man who held you up said something to you to the effect 'don't make me pull back the hammer on this gun?'

A: Yes.

Q: You also in your description of the man indicated he was about thirty years old, is that correct, in your opinion?

A: Yes.

Curtis: We have nothing further at this time."

The defendant argues that the evidence of the victim's pretrial identification was inadmissible for the reason that the defendant did not have the assistance of counsel at the time Bolio recognized the defendant at the Burlington courthouse.

*United States* v. *Wade, supra,* calls upon the courts, in reviewing any pretrial confrontation of the accused to determine whether the presence of counsel was "necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." The Court went on to hold that in-court identification by a witness to whom the accused was exhibited before trial in the absence of counsel must be excluded unless it can be established that such evidence had an independent origin or that error in its admission was harmless. *United States* v. *Wade, supra,* 18 L.Ed.2d at 1157 and 1166.

On the same day that *Wade* was announced the Court recognized "that confrontations for identification can be and often have been conducted in the absence of counsel with scrupulous fairness and without prejudice to the accused at trial." *Stovall* v. *Denno,* 388 U.S. 293, 87 S.Ct. 1967, 1971, 18 L.Ed.2d 1199, 1204 (1967). This recognition was preliminary to its decision that a confrontation of the accused without aid of counsel in a hospital room of his victim was not so unnecessarily suggestive as to violate the requirements of due process. And in *Stovall* the identifying witness was asked by the officer, who accompanied the accused in handcuffs, if the prisoner "was the man."

The record presented in this appeal does not yield up the inference that the accused was called upon to face his accuser either in a customary lineup or in a man-to-man confrontation. The record indicates only that the witness observed the defendant on the third floor through an open doorway at the courthouse. The defendant was not pointed out to the victim. No one indicated to the witness that "this was the man." It

appears that the witness was not aware that he was going to identify the subject. And no claim is made that the prior photographic identification was improper or suggestive. See *Simmons* v. *United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247, 1253 (1968).

There is ample justification in the record to support the conclusion that Bolio's identification at the trial was based entirely on his observation of the defendant at the time of the holdup. The observation was at close range across a counter, two feet in width. There is no indication that the description given to the police immediately after the robbery was at variance from the witness' testimony at the trial.

■■ In this context of the record we are persuaded that the positive identification made by the witness at the trial was based on his observation of the defendant during the commission of the offense. And there is nothing about the facts and circumstances which attended the pretrial identification to give rise to any "substantial likelihood of irreparable misidentification." *Coleman* v. *Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *State* v. *Bruley,* 129 Vt. 124, 274 A.2d 467, 470 (1970).

The remaining questions in this appeal are advanced by the defendant in his own written brief which he filed independently of that submitted by his assigned counsel. He questions the validity of the information presented against him for the reason that it was signed by the deputy state's attorney, rather than by the principal state's attorney elected by the voters.

■ The Legislature has conferred upon deputy state's attorneys "all the powers and duties of state's attorneys except the power to designate someone to act in the event of their own disqualification." 24 V.S.A. § 362. A special or deputy prosecutor appointed by virtue of statutory authority is bound to the same standards of conduct and vested with the same power as the duly elected state's attorney he has been called upon to assist. *Petition of Dusablon,* 126 Vt. 362, 365, 230 A.2d 797 (1967).

■■ The defendant has offered nothing of substance to indicate the authority conferred upon such officers exceeds the limits of our constitution. Had the point been well taken, it

would not have impaired the jurisdiction of the trial court. The error claimed is without merit. *State* v. *Levy,* 113 Vt. 374, 379, 34 A.2d 370 (1943).

The same holds true of the defendant's argument that the trial court was illegally constituted by the failure of the General Assembly to provide for assistant judges in the establishment of the district court system. This contention was recently considered and rejected in *Woodmansee* v. *Smith,* 129 Vt. 284, 276 A.2d 617, 618 (1971).

We have found no prejudice to the defendant in the errors assigned. The record indicates the accused was fairly tried; his conviction correctly entered.

*Judgment affirmed.*