LARRY ALLEN SCALES *v.* STATE OF MARYLAND

[No. 80, September Term, 1971.]

*Decided December 1, 1971.*

The cause was argued before MORTON, THOMPSON and MOYLAN, JJ.

*Joseph F. McBride,* with whom were *Robert S. Hoyert, Robert A. Diemer, Bill L. Yoho, Roy W. Hooten* and *Hoyert, Diemer, Yoho, Hooten & McBride* on the brief, for appellant.

*John P. Stafford, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Robert W. King, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Larry Allen Scales, was convicted in the Circuit Court for Prince George's County by Judge Samuel W. H. Meloy, sitting without a jury, of robbery with a deadly weapon. His sole contention, upon this appeal, is that a tire iron and a payroll slip were unconstitutionally seized from his automobile and therefore erroneously admitted into evidence against him.

On April 18, 1970, at approximately 4:45 p.m., Mr. Benjamin Allen, a part owner of the PMT Trash Company in Seat Pleasant, Maryland, was standing outside of that business premises. An individual approached him who identified himself as a Mr. Gibson. The ostensible Mr. Gibson claimed that he was an employee of Mr. Allen's company and he requested the wages then due him. Mr. Allen agreed to reopen the building and obtain the owed wages but pointed out that he had inadvertently locked himself out of the building. The ostensible Mr. Gibson offered to help him effect an entry, obtained a tire iron from his automobile which was parked close by, and forced the door open with the tire iron. Mr. Allen

indicated that he would go upstairs to obtain the money and asked the wage earner to remain downstairs. The alleged Mr. Gibson agreed, stating that he would first take the tire iron back to his automobile and would then use the men's room. Mr. Allen remained upstairs for between ten and fifteen minutes, computing and drawing "Mr. Gibson's" wages. He then returned to the lower floor and turned over the monies to this "Mr. Gibson." As the two were then walking out of the room and preparing to go outside, Mr. Allen was struck from behind and fell to the floor. He turned and saw "Mr. Gibson" holding a tire iron over his head and ordering him to go back upstairs. He complied and was there robbed of all the money which was kept in the upstairs portion of the building, approximately $850. The assailant threatened that "he would split Allen's head open" if more money was not turned over. All the while, he brandished the tire iron over Mr. Allen's head. He then placed Mr. Allen in a closet and closed the closet door. He threatened to kill him if Mr. Allen came out. He then disappeared from the premises.

Within fifteen minutes of the robbery, Detective Raymond E. Daniels of the Prince George's County Police Department had responded to the scene of the crime. He there learned from Mr. Allen and from James Williams, Mr. Allen's partner in the PMT Trash Company, that the robber—the ostensible Mr. Gibson—was, indeed, one Larry Scales, who had been hired by Mr. Williams and had done two days' work at the company during the preceding week. He ascertained from a telephone number that Larry Scales lived at 5213 Newton Street in Bladensburg. He learned from Mr. Allen that the automobile driven by Scales, and which contained the tire iron, was a late-model Pontiac, with either a gold or brown bottom and a dark-colored top, possibly vinyl.

At approximately 11 p.m. that evening, Detective Daniels proceeded to 5213 Newton Street for the sole purpose of arresting the appellant. Before going into

the apartment complex there located, however, he no-
ticed a late-model Pontiac, with a gold-colored bottom
and a black vinyl top, sitting on the parking lot of the
apartment project. He was attracted to it by a lighted
dome light. He shined a flashlight inside the unoccupied
automobile and was thereby able to observe a tire iron
lying on the floor on the passenger side of the vehicle.
He opened the door and removed the tire iron, part of
which extended underneath the seat. He testified that
when he pulled the tire iron out, he heard a rustle of
paper. He looked down and found an employment sheet
and a brown pay envelope. Both the tire iron and the pay
envelope were received in evidence over the appellant's
objections.

It cannot be gainsaid that the search of the automobile
did not begin until Detective Daniels actually opened the
door of the car. In *Ferguson v. State,* 236 Md. 148, it
was held that it was not a search to see evidence of
crime through a car window in the daytime and that the
officer, in looking through the window, was not a tres-
passer, the vehicle being parked on a public lot. It has
similarly been held that a police officer commits no in-
trusion within the contemplation of the Fourth Amend-
ment when he observes a crime being committed within
a house by peeking through a side window, *Griffin v.
State,* 200 Md. 569; when he observes stolen articles in
a garage by looking through the open door of that gar-
age, *Minnick v. State,* 4 Md. App. 81; when he observes
criminal activities within a house by looking through an
open window even with the aid of binoculars, *Johnson
v. State,* 2 Md. App. 300; and when he observes criminal
activity within a motel room by looking through an open
door, *Mullaney v. State,* 5 Md. App. 248. The law of
Maryland is equally well established that the shining of
a flashlight into a darkened vehicle does not render ob-
servations made thereby constitutionally improper,
*Sweeting v. State,* 5 Md. App. 623, 626-628. When De-
tective Daniels was standing on the parking lot next to
the appellant's vehicle, he was in a place where he and

every other member of the public had a right to be. When Detective Daniels looked through the window into the interior of the car and directed his flashlight so as to facilitate that look, he was doing that which he and every member of the public had a right to do. As a result of that look, he saw, protruding from underneath the seat, a tire iron within clear visibility.[1] At that point, there had been no intrusion, within the contemplation of the Fourth Amendment, into any constitutionally protected area. It is from that point that we measure the reasonableness of the ensuing search.

We feel that the search in this case was constitutionally proper under the so-called "automobile exception" to the basic constitutional rule that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U. S. 347, 357. The "automobile exception" to the search warrant requirement was first announced in *Carroll v. United States,* 267 U. S. 132 (1925) and

---

1. In this context, we studiously avoid the phraseology "in plain view" to avoid any implication that the so-called "plain view doctrine" is being invoked. That doctrine is not here applicable. Needless confusion is frequently engendered by the employment in many opinions of the same phrase—"in plain view"—to describe two visually similar but legally distinct situations. The "plain view doctrine," as described in *Coolidge v. New Hampshire,* 29 L. Ed. 2d 564, refers exclusively to the legal justification—the reasonableness—for the seizure of evidence which has not been particularly described in a warrant and which is inadvertently spotted in the course of a constitutional search already in progress or in the course of an otherwise justifiable intrusion into a constitutionally protected area. It has no applicability when the vantage point from which the "plain view" is made is not within a constitutionally protected area. It is, therefore, literarily discreet to use for such latter situations some alternative phraseology such as "clearly visible," "readily observable," "open to public gaze," etc., rather than to employ the words "in plain view" in their purely descriptive capacity, lest the unwary reader read them in their other and talismanic capacity as an invocation of the doctrine of the same name in non-intrusive situations where it is not applicable. A "plain view," under its first connotation, is no intrusion at all and needs no justification; a "plain view," under its second connotation, is a justifiable intrusion, with the "plain view doctrine" articulating the rationale of the justification.

has been reaffirmed and interpreted by the Supreme Court in *Husty v. United States,* 282 U. S. 694 (1931); *Scher v. United States,* 305 U. S. 251 (1938); *Brinegar v. United States,* 338 U. S. 160 (1949); *Dyke v. Taylor Implement Mfg. Co.,* 391 U. S. 216 (1968). See also *Middleton v. State,* 10 Md. App. 18, and *Johnson v. State,* 10 Md. App. 652.

*Carroll* recognized that there was a fundamental difference between a dwelling house, office, store or other structure, on the one hand, and an automobile, ship, or other readily movable vehicle, on the other hand, and that probable cause could sometimes be sufficient unto itself to justify the warrantless search of the latter whereas it could never justify the warrantless search of the former. *Chambers v. Maroney,* 399 U. S. 42 (1970), extended the *Carroll* doctrine by holding that wherever a search on the highway or street would be justified under *Carroll,* in the first instance, it would also be permissible to seize the automobile and search it later at a police station. The Court there said:

> "For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." 399 U. S. at 52.

In the case at bar, it is clear that when Detective Daniels opened the door of the appellant's automobile, he had probable cause to believe that that automobile contained an instrumentality and possibly other evidence of the crime. The victim had described to him a late-model Pontiac with either a gold or brown bottom and a dark-colored top, possibly of vinyl. The vehicle searched was a late-model Pontiac with a gold-colored bottom and a black vinyl top. It was sitting on the parking lot be-

side the apartment project wherein lived the appellant, whom Detective Daniels had come to arrest as the perpetrator of the crime. Detective Daniels had had described to him the tire iron which was the instrumentality of the crime and which had been taken by the perpetrator from the perpetrator's automobile. He saw a tire iron readily observable on the floor of the car from his non-intrusive vantage point. As of that moment, Detective Daniels possessed ample probable cause for the search of the automobile and for the seizure of any evidence found therein.

In interpreting *Carroll*, the Supreme Court in *Coolidge v. New Hampshire*, 29 L. Ed. 2d 564, 578-581 (1971) made it clear, however, that probable cause is but one of the two necessary pre-conditions for a warrantless search of a vehicle. The other pre-condition—exigent circumstances—must also exist. In explaining the *Carroll* doctrine, the Supreme Court said:

> "The underlying rationale of *Carroll* and of all the cases which have followed it is that there is 'a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where *it is not practicable to secure a warrant* because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' 267 US, at 153, 69 L Ed at 551, 39 ALR 790. (Emphasis supplied.)
> As we said in *Chambers, supra,* at 51, 26 L Ed 2d at 428, 'exigent circumstances' justify the warrantless search of 'an automobile *stopped on the highway,*' where there is probable cause, because the car is 'movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.'

'[T]he opportunity to search is fleeting. . .'
(Emphasis supplied.)"

Under all of the facts of this case, we feel that the situation facing Detective Daniels, as he stood alone late at night upon that parking lot, was sufficiently exigent to render his actions reasonable and to bring them within the broad rationale of the *Carroll* doctrine rather than within the *Coolidge* limitation upon that doctrine. Had he left the scene to obtain a warrant, the readily movable automobile could well have been moved by the appellant, his relatives or his friends. In the alternative, the evidence could have been removed from the automobile. The lit condition of the dome light could well have fostered in him an additional apprehension that the car was not "at rest" for the remainder of the night. No reinforcements stood at his side to keep the car under surveillance while he went in search of a warrant. Nor would such reinforcements, had they been present, have had any legal justification to prevent anyone from moving the car or removing its contents.

The situation prevailing in *Coolidge,* which the Supreme Court held to be non-exigent, was diametric to that facing Detective Daniels in this case. In *Coolidge,* officers had been possessed of ample probable cause for the search of Coolidge's automobile for several weeks and had, indeed, gone through the process of obtaining a search warrant for the car.[2] The car itself, let alone its readily observable contents, was not, as here, a fortuitous and unexpected discovery. In *Coolidge,* a full team of officers was upon the scene. In *Coolidge,* Coolidge himself had been arrested and transported to the station house before the search of his automobile commenced.

---

2. That warrant was held to be constitutionally defective by Part I of the *Coolidge* opinion because it had been issued by the Attorney General of New Hampshire, "acting as a justice of the peace" but nevertheless an "officer engaged in the often competitive enterprise of ferreting out crime," rather than by a truly "neutral and detached magistrate." The *Carroll* doctrine was simply advanced at the Supreme Court level as an alternate and stand-by justification for the search.

In *Coolidge,* the wife of Coolidge had also been removed to quasi-protective custody. The automobile there was not simply effectively immobilized with all its feasible movers "out of action," but the police had, furthermore, had ample opportunity for days and even weeks to obtain a proper warrant for its search. There was no conceivable exigency. The Supreme Court there held, at 29 L. Ed. 2d 580, "In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' *Carroll, supra,* at 153, . . . and the 'automobile exception,' despite its label, is simply irrelevant." The extreme circumstances there are simply inapposite to the case at bar. This was rather one of those circumstances described in *Carroll* and reiterated in *Coolidge* where it was "not practicable to secure a warrant."

We hold that the two-pronged test—probable cause and exigent circumstances—of *Carroll-Coolidge* was satisfied in both of its aspects; that the warrantless search of the appellant's automobile was, thereby, constitutionally proper; and that the trial court was, therefore, correct in receiving the fruits of that search into evidence.

*Judgment affirmed.*