# State of Vermont v. Donald A. Badger, Jr.

[450 A.2d 336]

No. 340-81

Present: Barney, C.J., Billings, Hill and Underwood, JJ.,
and Shangraw, C.J. (Ret.), Specially Assigned

Opinion Filed July 13, 1982

432

John J. Easton, Jr., Attorney General, Glenn A. Jarrett, Assistant Attorney General, and Christopher Micciche, Law Clerk (On the Brief), Montpelier, and Raymond G. Bolton, Bennington County State's Attorney, Bennington, for Plaintiff-Appellant.

434

*David A. Howard,* Bennington County Public Defender, Bennington, and *Barry E. Griffith,* Rutland, for Defendant-Appellee.

**Hill, J.** The defendant, Donald Badger, Jr., has been charged with second degree murder. This interlocutory appeal concerns the suppression of physical evidence and a confession given by the defendant. The State contends that the trial court erred in granting the defendant's motions to suppress. We granted the State's motion for an interlocutory appeal under V.R.A.P. 5(b).

On appeal, the State has not challenged the factual findings of the trial court on the motions to suppress. A detailed recitation of those findings follows, as it is necessary to the resolution of the legal issues presented in this case.

## I.

The murder took place in the afternoon of August 9, 1980. The investigating officer received a call from a witness who reported that the defendant was with the victim a short time before the murder, and within a five minute walk of where the body was discovered. At 11:15 that evening, the officer telephoned the defendant's home. He asked the defendant's father (the defendant was sixteen years old at the time) to bring the defendant to the Manchester police station. In response to the father's question, the officer stated that they should come to the police station immediately.

A short time later, the defendant and his father arrived at the police station. There, they entered a room with three officers, and the door was closed. The police recorded the subsequent interrogation.

An officer questioned the defendant on his contact with the deceased on that day. The officer did not issue the *Miranda* warnings. The questioning was close and intense. The interrogating officer scrutinized the defendant's answers, comparing the responses to other evidence, and pointing out inconsistencies.

One-third of the way through this interrogation, one of the officers noted a spot of blood on the defendant's sneaker. The defendant stated that the blood came from a cut on his finger. The officers inspected the shoe, and remarked that its tread

pattern matched a footprint in blood at the scene of the crime. Then, there was the following dialogue:

Officer: I think we're going to have to hang onto your shoes for you tonight, O.K.?

Defendant: Do what you want to do.

Officer: I'm gonna have to send those to the lab and have them check that blood . . . to see if it matches you . . . know what your blood type is?

Defendant: No, I don't.

Officer: I'm going to have to get a blood test from ya. I want to do that tonight. . . .

The officer had yet to advise the defendant of his *Miranda* rights.

The officer further questioned the defendant. He then asked the defendant's father whether he had any objections to the officers seizing the shoes. The father replied that he did not, believing that he had no other choice, as the police could have seized the shoes with a court order.

Now the questioning became increasingly accusatory. The officer emphasized inconsistencies between the defendant's testimony and other evidence. He described a wealth of evidence available to the police as a means of verifying, or contradicting, the defendant's story. The defendant asked the officer, "what's going on?" The officer replied: "Well, I'll tell you what's going on. . . . Right now you're a suspect in a homicide. . . ."

The officer still did not issue any *Miranda* warnings.

The officer continued the questioning, and made numerous statements concerning the consequences to the defendant should he confess to murder. He emphasized that the defendant need not be incarcerated. He asserted that the defendant could not go to jail, because he was a juvenile. He tempered this assertion in a vague retreat, stating that the defendant's fate would rest with a court, not the officer. The officer also emphasized the defendant's duty to be honest for the sake of his father.

After fifty minutes of such interrogation, the defendant admitted his responsibility for the crime. Only then did the

police issue the *Miranda* warnings. The defendant signed a waiver of those rights, gave a full confession (hereinafter termed the "first confession"), and signed a statement of that confession which had been transcribed by the interrogating officer. The defendant signed the confession at approximately 1:20 a.m.

Throughout the questioning, neither the defendant nor his father were told that they could leave. The defendant became emotionally upset under the persistent interrogation, and broke down crying at times. Both the defendant and his father, in reliance on the officer's representations, believed that he could only be tried as a juvenile. The defendant's father was present during all the questioning. He believed that he was acting as his son's guardian, but he was never given the opportunity of consulting privately with the defendant.

After the defendant signed the confession, he was photographed and fingerprinted, and then he went home with his father. The interrogating officer followed the Badgers home, where the defendant's father gave the officer the clothing worn by the defendant on the day of the murder. The officer did not obtain a search warrant, and relied on the consent of the defendant's father to justify his action.

At approximately 11:30 a.m. on the following day, the defendant and his parents arrived at the Shaftsbury office of the Vermont State Police. The same officer who had interrogated the defendant the previous night met the Badgers, and asked the defendant's father to permit the defendant to take a polygraph test. The father stated that he preferred that the defendant first see a psychologist at a prearranged appointment. Following the appointment, the defendant and his parents returned to the Shaftsbury office.

At approximately 4:00 p.m. the officer resumed the interrogation. The defendant and his father understood that the defendant had two choices: submit to the questioning or take a lie detector test. The second interrogation session was prompted by the officer's suspicion concerning the accuracy and completeness of the defendant's initial statement.

The officer advised the defendant of his *Miranda* rights at the commencement of the second interrogation session. The defendant signed a waiver of his rights, and made a second confession (hereinafter termed the "second confession")

which clarified some of the inconsistencies posed by his initial statement. During this second interrogation, the defendant and his father continued to believe that the defendant could only be prosecuted as a juvenile. The defendant had not yet spoken with an attorney.

By information, the State charged the defendant as an adult with second degree murder. See 13 V.S.A. § 2303. The defendant filed three motions to suppress evidence. First, he asserted that the initial confession should be suppressed under the fourth, fifth, sixth, and fourteenth amendments of the United States Constitution; the tenth and eleventh articles of the Vermont Constitution; and, under 13 V.S.A. § 5234. Second, he asserted that the second confession should be suppressed under the same authorities. Third, he moved to suppress all physical evidence seized under the same authorities.

The trial court granted the motions and suppressed all the challenged evidence. The court found that "in the totality of the circumstances, the defendant was a suspect in the minds of the police from the outset and that both he and his father could reasonably have formed the belief at the time when the shoes were seized that the defendant was not free to leave." Thus, the court suppressed all statements made from this point in time to the issuance of *Miranda* warnings. The Court then held that this initial illegality tainted the first confession, obtained after the issuance of *Miranda* warnings, and suppressed that confession as a fruit of the initial illegality. The court also suppressed the first confession on two other grounds. It held that the defendant had not knowingly and intelligently waived his rights, and that the confession was not voluntary.

The court also suppressed the second confession that was obtained on the following day. It relied on two separate grounds. First, the court held that the second confession was a fruit of the earlier illegality. Second, the court held that the defendant had not knowingly and intelligently waived his rights.

Finally, the court granted the defendant's motion to suppress all the physical evidence. The court held that the warrantless seizure of the shoes could not be upheld, as the defendant's consent to the seizure was involuntary, and there had been no showing of exigent circumstances to allow seizure

under the plain view doctrine. The court also suppressed the clothing given to the police by the father on the ground that the prosecution had not met "its burden of showing that the defendant's consent was voluntary and not a product of coercion."

This Court granted the State's motion for interlocutory appeal under V.R.A.P. 5(b).[1] On appeal, the State has not challenged the suppression of the first confession. Thus, we only consider the propriety of excluding the second confession and the physical evidence. Since the authority of the Vermont Constitution cannot validate the admission of matters prohibited under the fourth, fifth, and fourteenth amendments, we begin by examining the order under the United States Constitution.

## II.

Under *Mapp* v. *Ohio*, 367 U.S. 643 (1961), and *Miranda* v. *Arizona*, 384 U.S. 436 (1966), this Court is bound by federal constitutional principles controlling the admission of evidence and confessions obtained in violation of the fourth, fifth, and fourteenth amendments. See *State* v. *Rocheleau*, 131 Vt. 563, 566, 313 A.2d 33, 36 (1973). We conclude that the second confession and the defendant's clothing were properly excluded under federal standards. We further conclude, however, that the trial court erred in suppressing the bloodstained shoes as a matter of federal law.

## A.

■ To be admissible, a confession must (1) be voluntarily given, see *Hutto* v. *Ross*, 429 U.S. 28, 30 (1976); *State* v. *Lapham*, 135 Vt. 393, 400, 377 A.2d 249, 253 (1977); (2) if elicited by custodial interrogation, be preceded by warnings of an individual's constitutional rights, *Miranda* v. *Arizona*,

---

[1] This Court granted the State's motion for an interlocutory appeal because of the probable significance of the suppression orders to the outcome of this case. Thus, we concluded that the three criteria of V.R.A.P. 5(b) were satisfied. See *In re Pyramid Co.*, 141 Vt. 294, 302, 449 A.2d 915, 918 (1982); *Castle* v. *Sherburne Corp.*, 141 Vt. 157, 164, 446 A.2d 350, 354 (1982); cf. *State* v. *Karcz*, 134 Vt. 187, 188, 352 A.2d 687, 688–89 (1976) (holding interlocutory appeal inappropriate under the facts of that case).

*supra,* 384 U.S. at 444: *State* v. *Breznick,* 134 Vt. 261, 264, 356 A.2d 540, 542 (1976); and (3) not be the fruit of a prior illegality, see *Brown* v. *Illinois,* 422 U.S. 590, 603 (1975); *Darwin* v. *Connecticut,* 391 U.S. 346, 349 (1968). See also *Taylor* v. *Alabama,* 102 S. Ct. 2664, 2667 (1982). In this case, the second confession clearly fails these standards.

 First, it is important to emphasize that it is the prosecution's burden to establish by a preponderance of the evidence that the confession was voluntarily given. *Lego* v. *Twomey,* 404 U.S. 477, 489 (1972). The State also has the burden of proving that the defendant knowingly and intelligently waived his *Miranda* rights. *Tague* v. *Louisiana,* 444 U.S. 469, 470-71 (1980); *North Carolina* v. *Butler,* 441 U.S. 369, 373 (1979). We must now apply these standards to the trial court's factual findings, which, we repeat, the State has not challenged. These findings amply support the lower court's exclusion of the second confession on the grounds that: (1) it was the fruit of the prior involuntary confession; and (2) the defendant had not knowingly and intelligently waived his *Miranda* rights.

1.

On appeal, the prosecution has not challenged the suppression of the first confession. For purposes of this decision, that portion of the order stands unchallenged. See, e.g., *Northern Terminals, Inc.* v. *Smith Grocery & Variety, Inc.,* 138 Vt. 389, 397, 418 A.2d 22, 25 (1980); *In re Smith, Bell & Hauck Real Estate, Inc.,* 132 Vt. 295, 300, 318 A.2d 183, 187 (1974). Thus, half of the issue on whether the second confession should be suppressed as the fruit of prior illegality is settled: there is no question concerning the "prior illegality" element. What remains is whether the subsequent confession is a "fruit" of the prior illegality.

 There are two relevant elements to the inquiry whether the second confession should be suppressed as a product of the first confession. The first is causation. If the taint of the initial illegality infects the later confession then the second confession is the product of the initial misconduct. See *Darwin* v. *Connecticut, supra,* 391 U.S. at 349; *United States* v. *Knight,* 395 F.2d 971, 974 (2d Cir. 1968) (constru-

ing a companion case to *Miranda, Westover* v. *United States,* 384 U.S. 436 (1966)). Second, and closely related to the first, is whether intervening events break the causal chain and dissipate the effect of the taint. See *United States* v. *Toral,* 536 F.2d 893, 896 (9th Cir. 1976). See also *Brown* v. *Illinois, supra,* 422 U.S. at 603–04; *Clewis* v. *Texas,* 386 U.S. 707, 710 (1967).

■ Here, the second confession is unquestionably a product of the initial confession. The trial court specifically found that the whole reason for the second interrogation session was that the officer "suspected that the defendant's initial statements were not accurate or complete." The interrogation focused completely upon correcting inaccuracies in the first confession. Furthermore, the court found that the same factors which rendered the initial confession involuntary, a decision not challenged on appeal, were operating during the second interrogation. Under these circumstances, we agree with the trial court that the taint of the original illegality caused the second confession. Thus the involuntariness of the initial confession fatally tainted the second confession. See *Clewis* v. *Texas, supra,* 386 U.S. at 710; *Darwin* v. *Connecticut, supra,* 391 U.S. at 349.

The State vigorously contends that the intervening issuance of *Miranda* warnings purged that taint. We disagree. In *Brown* v. *Illinois, supra,* 422 U.S. at 603, the United States Supreme Court held that intervening warnings alone could not purge the prior illegality of an illegal arrest. Similarly, numerous federal courts have held that warnings alone could not purge the taint from a prior illegal interrogation. See, e.g., *Westover* v. *United States, supra,* 384 U.S. at 495; *United States* v. *Toral, supra,* 536 F.2d at 896–97. The critical factor is whether, under the totality of the circumstances, the warnings purged the original taint sufficiently to render the subsequent confession voluntary. See, e.g., *Clewis* v. *Texas, supra,* 386 U.S. at 710.

■ In this case, the trial court's unchallenged findings demonstrate that the warnings did not purge the taint of illegality. First, the unchallenged trial court holding was that *Miranda* warnings were insufficient to save the first con-

fession from suppression. Thus, the State is attempting to justify the second confession by relying on an event already discredited in this factual situation. In addition, the close relationship in time and circumstances between the two confessions minimized the salutary effects of the *Miranda* warnings. See *United States* v. *Nash*, 563 F.2d 1166, 1169 (5th Cir. 1977). Most important, as we will see, the taint of involuntariness infected both confessions. Thus, for the State to prevail the warnings needed to dispel a fundamental flaw in the interrogation. See *Brown* v. *Illinois, supra,* 422 U.S. at 603–04. A mere fifteen hours after obtaining a confession by concededly illegal methods, the officer used that confession to extract a second one, wholly for the purpose of supplementing the first confession. The warnings, designed as a prophylactic measure, see *Michigan* v. *Payne*, 412 U.S. 47, 53 (1973), were insufficient to cure such blatant abuse or to compensate for the coercion in this case.[2] Thus, we conclude that the trial court correctly suppressed the second confession as the fruit of earlier illegality. See *United States* v. *Crews*, 445 U.S. 463, 470 (1980).

2.

We also agree with the trial court's conclusion that the prosecution had not met its burden of proving a knowing and intelligent waiver of *Miranda* rights prior to the second confession. Once again, the court must consider the totality of the factual circumstances in evaluating this issue of waiver. *North Carolina* v. *Butler, supra,* 441 U.S. at 374–75. The prosecution has not challenged the trial court's findings that the same factors which invalidated the initial waiver influenced the second waiver. We find that these factors were more than sufficient to support the conclusion that there was no voluntary waiver of the *Miranda* rights prior to the second confession. The coercive atmosphere, the youth of the defendant, the absence of counsel, the threat of a lie detector test

---

[2] Thus, the facts of this case are far different from those in *State* v. *Rocheleau, supra,* where this Court found the challenged statements to be voluntary. *Id.* at 571–72, 313 A.2d at 39–40. Furthermore, intervening federal precedents, discussed in the text, have cast new light on the impact of *Miranda* warnings under the federal constitution.

as the only available alternative to waiver, combined to render the second waiver suspect. See *Eleventh Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1980–81,* 70 Geo. L.J. 465, 532 (1981). There was ample evidence to support the trial court's conclusion on the waiver issue. Consequently, this Court will not disturb the ruling on appeal. See *State* v. *Breznick, supra,* 134 Vt. at 265, 356 A.2d at 542.

## B.

### 1.

We next turn to the seizures of the clothing and shoes. As an initial matter, the State claims that, as they were surrendered voluntarily, there was no seizure of these items within the meaning of the fourth amendment. Therefore, the State argues that the items cannot be suppressed under the authority of that amendment.

Before the protections of the fourth amendment are triggered, there must be some activity that is regulated by the amendment, i.e., either a search or a seizure. Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 356 (1974). There is no question that the police did not engage in a search to obtain evidence from the defendant. See *id.* We believe, however, that the items were "seized" within the fourth amendment meaning of that term.

■■ The classic definition of a seizure is that it involves a forcible dispossession of property. *Hale* v. *Henkel,* 201 U.S. 43, 76 (1906). In *Coolidge* v. *New Hampshire,* 403 U.S. 443 (1971), the United States Supreme Court declined to hold that the police had engaged in a search and seizure, where the wife of the suspect produced the seized evidence "of her own accord." See *id.* at 489. This case falls between *Hale* and *Coolidge;* although the items were physically handed to the police, the trial court found that the consent to these transfers was involuntary. We believe that the involuntariness of the transfers is the decisive factor in this case, and renders them seizures within the fourth amendment. See *United States* v. *Coleman,* 628 F.2d 961, 966 (6th Cir. 1980).

In *Coolidge* the Court noted that "There is not the slightest implication of an attempt on [the policemen's] part to coerce or dominate her, or, for that matter, to direct her actions by the more subtle techniques of suggestion that are available to officials in circumstances like these." *Coolidge v. New Hampshire, supra,* 403 U.S. at 489. The instant case, however, stands in sharp contrast to *Coolidge.* In regards to all the items seized, the court concluded that the prosecution failed to meet its burden of proving that the consent to the taking of the articles was voluntary and not a product of duress or coercion. See *Schneckloth v. Bustamonte,* 412 U.S. 218, 222 (1973); *Bumper v. North Carolina,* 391 U.S. 543, 548 (1968).

Analytically, an involuntary transfer is indistinguishable from a forcible taking. Each involves a taking against the free will of the victim, although the former is accomplished by mental force, and the latter by physical force. This distinction, however, makes no constitutional difference. As the Supreme Court has noted in the context of confessions: "coercion can be mental as well as physical, and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 U.S. 199, 206 (1960). Similarly, if the consent to a search is invalid, there is a search for fourth amendment purposes. See, e.g., *Schneckloth v. Bustamonte, supra,* 412 U.S. at 222. It would be untenable to hold that involuntary consent does not preclude fourth amendment scrutiny of searches, but does bar review of seizures. The net effect would be to frustrate the purposes of the fourth amendment were we to read this taking out of the seizure clause. Abusive police misconduct would be immune from scrutiny, as long as it was shielded by the tainted veil of involuntary consent. This is impermissible.

## 2.

Since a warrant was not obtained for the seizures of the physical evidence, it is necessary for the State to justify the seizures under an exception to the warrant requirement. See *Mincey v. Arizona,* 437 U.S. 385, 390 (1978). The prosecution sets forth consent as justifying the seizure of the clothing and shoes, and, because the shoes were in plain view, they

were justified in seizing the shoes. We now turn to the consent argument.

The standard of review is critical to this issue. Voluntariness must be evaluated on a factual basis against the backdrop of the legal standards set by the United States Supreme Court. Again, it is imperative to note that the factual findings of the trial court have not been challenged on appeal. Our task is to determine whether the factual findings are sufficient to support the conclusion that the consent was involuntary as a matter of law. We conclude that the State has not met its burden on appeal, and that there are ample factual findings to support the trial court's conclusion.

The United States Supreme Court requires courts to evaluate the voluntariness of consent as a factual question based upon the totality of the circumstances. *Schneckloth* v. *Busta-monte, supra,* 412 U.S. at 222; *Bumper* v. *North Carolina, supra,* 391 U.S. at 548. The burden of proof on this issue falls on the prosecution. *United States* v. *Mendenhall,* 446 U.S. 544, 557 (1980). In applying these standards, the trial court concluded that the circumstances of this case did not support the conclusion that the consent was voluntarily given. A review of these findings shows ample evidence to support that conclusion.

 The defendant's youth, emotional state, the misleading statements of the police, the blatant violation of the defendant's *Miranda* rights, his father's unfamiliarity with the criminal justice system, all of these support the finding of involuntariness. See 2 W. LaFave, Search and Seizure § 8.2 (1978). In combination, the findings reveal an inherently coercive atmosphere that infected the consent to the seizure of the shoes and the clothing.[3] The trial court's conclusion

---

[3] Because we affirm the trial court's holding on the voluntariness issue, we need not address another potentially difficult issue posed by the seizure of the clothing, namely, the impact of a third party consenting to the seizure of evidence against the defendant. See *David Levell W.* v. *California,* 449 U.S. 1043, 1046–49 (1980) (Marshall, J., dissenting from the denial of certiorari); *In re E. T. C.,* 141 Vt. 375, 378–79, 449 A.2d 937, 940 (1982). As the Supreme Court made clear in *Bumper* v. *North Carolina, supra,* involuntariness vitiates the consent of suspects and third parties alike. See 391 U.S. at 548 n.11. Further-

is therefore supported by the evidence, and must be affirmed on appeal. *United States* v. *Mendenhall, supra,* 446 U.S. at 557; *State* v. *Breznick, supra,* 134 Vt. at 265, 356 A.2d at 542.

### 3.

The remaining ground urged by the State to justify the seizure of the shoes is the plain view doctrine. This doctrine, at least as articulated in *Coolidge* v. *New Hampshire, supra,* is not at issue in this case, because there was no search of the defendant. The seizure took place "without a prior physical intrusion into a constitutionally protected area." 1 W. La-Fave, *supra,* § 2.2, at 242. As Judge Moylan explained:

> The "plain view doctrine," as described in *Coolidge* v. *New Hampshire,* refers exclusively to the legal justification—the reasonableness—for the seizure of evidence which has not been particularly described in a warrant and which is inadvertently spotted in the course of a constitutional search already in progress or in the course of an otherwise justifiable intrusion into a constitutionally protected area. It has no applicability when the vantage point from which the "plain view" is made is not within a constitutionally protected area.

*Scales* v. *State,* 13 Md. App. 474, 478 n.1, 284 A.2d 45, 47 n.1 (1971) (citation omitted). Compare *id.* with *State* v. *Driscoll,* 137 Vt. 89, 98–99, 400 A.2d 971, 976–77 (1979).

▌ Thus, the visual observation of the bloodstained shoe by the police is beyond the scope of fourth amendment review. See 1 W. LaFave, *supra,* § 2.2, at 243. There remains, however, a single, more narrow issue: whether the warrantless seizure of the defendant's shoes was justified under the circumstances of this case.

▌ Two elements must coalesce to justify this seizure. First, the police must have had probable cause to believe that the shoes were evidence incriminating the defendant. See

more, as in *Bumper,* the defendant had a substantial possessory interest in both the items seized and the house in which they were located. See *Rakas* v. *Illinois,* 439 U.S. 128, 148 (1978).

*Warden* v. *Hayden,* 387 U.S. 294, 307 (1967); *State* v. *Driscoll, supra,* 137 Vt. at 99, 400 A.2d at 977. Second, there had to have been some exigent circumstance of sufficient weight to justify immediate seizure without resort to a warrant. See *Cupp* v. *Murphy,* 412 U.S. 291, 296 (1973).

 There can be no question that the police had sufficient probable cause to believe this evidence incriminated the defendant. Probable cause is measured on an objective standard.[4] See *State* v. *Murray,* 134 Vt. 115, 119, 353 A.2d 351, 355 (1976). The test is whether a reasonable person would conclude that the item to be seized was incriminating. See *id.* See also *Warden* v. *Hayden, supra,* 387 U.S. at 307; *State* v. *Phillips,* 140 Vt. 210, 216–17, 436 A.2d 746, 749–50 (1981). Under the facts of this case, it would have been patently unreasonable to conclude that the shoes were not incriminating evidence. The police knew that a bloody murder had been committed, and that some of that blood had probably splattered on the assailant. A reliable witness saw the defendant with the victim just a few minutes before the killing, near the place where the body was found. Yet, the defendant denied that he was with the victim at that time. A blood-stained shoe was certainly incriminating under these circumstances. Accord, *McCorquodale* v. *State,* 233 Ga. 369, 375, 211 S.E.2d 577, 582 (1974), *cert. denied,* 428 U.S. 910 (1976); *Commonwealth* v. *Meehan,* 377 Mass. 552, 559–60, 387 N.E.2d 527, 531–32 (1979), *cert. dismissed,* 445 U.S. 39 (1980).

 We now turn to the second factor relevant to this seizure. Without elaboration, the trial court concluded that there were no exigent circumstances to justify the warrant-

---

[4] The defendant vigorously argues that there was no probable cause to seize the shoes. He relies on the following colloquy at the suppression hearing between the officer and the defendant:

Q. So, in other words, you felt there was probable cause to believe [the shoes] were evidence of crime or the commission of a crime?

A. Not actual commission of a crime but is evidence that he knew more about it than what he was telling me.

Beyond the ambiguity of this answer, the more damaging blow to this argument is that it focuses on subjective belief, rather than the correct objective standard for measuring probable cause.

less seizure. We disagree with this conclusion. Sufficient exigent circumstances were noted by the trial court itself: "it was apparent to the officer [who interrogated the defendant] that *the shoes could have been destroyed or the blood spots removed by the defendant.*" (Emphasis added.) The threatened destruction of evidence has long been recognized as an exigent circumstance sufficient to allow warrantless intrusions under some circumstances. See, e.g., *Cupp* v. *Murphy, supra,* 412 at 296; *Schmerber* v. *California,* 384 U.S. 757, 770–71 (1966). We can imagine few circumstances more exigent than this, where the solution to a murder could rest on the preservation of a single, vulnerable bloodstain.

We conclude that the trial court erred in suppressing the bloodstained shoes under the fourteenth amendment. Given the "ready destructibility of the evidence," *Cupp* v. *Murphy, supra,* 412 U.S. at 296, and the limited intrusion on the defendant's fourth amendment interests necessary to take the shoes, see *Payton* v. *New York,* 445 U.S. 573, 587 (1980), it was reasonable for the police to make this warrantless seizure. In this case, it would have been "a needless inconvenience, and . . . dangerous . . . to the evidence . . . to require [the police] to ignore [the evidence] until they [had] obtained a warrant particularly describing it." *Coolidge* v. *New Hampshire, supra,* 403 U.S. at 468 (plurality opinion of Stewart, J.). Accordingly, the fourth amendment does not prohibit the introduction of the shoes at trial.

## III.

We now turn to the resolution of the claims in this case under the Vermont Constitution. At first blush, consideration of state law for most of the defendant's claims may be considered superfluous. With the exception of the shoes, federal law seems to provide a complete remedy for the defendant. This impression is mistaken. Several factors require consideration of the Vermont constitutional claims raised by the defendant's suppression motions. Indeed, resolution of these claims is essential to the sound and final disposition of this case.

Our first concern is comity between this Court and the United States Supreme Court. We stand on a different

footing when we evaluate federal constitutional claims. On federal issues, we are no more than an intermediate court, attempting to apply the "supreme law of the land," *Cooper* v. *Aaron,* 358 U.S. 1, 18 (1958), as pronounced by the United States Supreme Court. Supreme Court authority over our federal rulings is absolute. Yet, if our ruling is based upon an adequate and independent state ground, federal review is limited to a determination of whether Vermont law violates some provision of federal law. See *Pruneyard Shopping Center* v. *Robins,* 447 U.S. 74, 79 (1980); *Delaware* v. *Prouse,* 440 U.S. 648, 651–53 (1979); *Murdock* v. *City of Memphis,* 87 U.S. (20 Wall.) 590, 626 (1875). See generally Sager, *Fair Measure: The Legal Status of Underenforced Constitutional Norms,* 91 Harv. L. Rev. 1212, 1247–50 (1978). Our unique relationship poses the potential for great friction between the state and federal judiciaries, and concomitant damage to the authority, efficiency, and finality of the United States Supreme Court. This friction has sparked numerous unfortunate clashes. The nominal "law of the land" has been quickly reversed by many state supreme courts' belated discovery—after federal reversal—of "adequate and independent state grounds." See *Developments in the Law—The Interpretation of State Constitutional Rights,* 95 Harv. L. Rev. 1324, 1389–90 (1982) (listing numerous examples). The United States Supreme Court should not be so vulnerable to collateral attack. Nor should the Court have to waste its scarce resources on illusory controversies. Fulfillment of this Court's responsibilities as a member of the federalist system requires us to consider the availability of state grounds before federal appeal.

The institutional concern is buttressed by an even weightier consideration: the authority of the Vermont Constitution itself. The Vermont Constitution is the fundamental charter of our state, and it is this Court's duty to enforce the constitution. See *State* v. *Ludlow Supermarkets, Inc.,* 141 Vt. 261, 264, 448 A.2d 791, 793 (1982). Although the Vermont and federal constitutions "have a common origin and a similar purpose," *State* v. *Brean,* 136 Vt. 147, 151, 385 A.2d 1085, 1088 (1978), our constitution is not a mere reflection of the federal charter. Historically and textually, it differs from the United States Constitution. It predates the federal counter-

part, as it extends back to Vermont's days as an independent republic. It is an independent authority, and Vermont's fundamental law.

Although we have frequently treated parallel state and federal provisions in a similar manner, particularly in the area of criminal procedure, see, e.g., *id.* at 151, 385 A.2d at 1088; *In re Huard,* 125 Vt. 189, 194, 212 A.2d 640, 644 (1965), we have never intimated that the meaning of the Vermont Constitution is identical to the federal document. Indeed, we have at times interpreted our constitution as protecting rights which were explicitly excluded from federal protection. *In re E. T. C., supra,* 141 Vt. at 378, 449 A.2d at 939; *State* v. *Ludlow Supermarkets, Inc., supra,* 141 Vt. at 268, 448 A.2d at 794; *State* v. *Becker,* 130 Vt. 153, 156, 287 A.2d 580, 582 (1972), *noted in Developments, supra,* 95 Harv. L. Rev. at 1388. We are free, of course, to provide more generous protection to rights under the Vermont Constitution than afforded by the federal charter. See *In re E. T. C., supra,* 141 Vt. at 378, 449 A.2d at 939. Thus, the Vermont Constitution provides an independent authority which, on the facts of this case, is of equal importance with the federal charter.

The most important reason for disposing of the state law claims is our duty to the litigants. The defendant in this case has specifically invoked the protections of the Vermont Constitution. Our rulings on his federal claims are all subject to federal reversal. Review of his claims under the Vermont Constitution, however, may yield adequate and independent state grounds to support our judgment, thereby giving a final disposition to some of the claims at issue in this appeal. If our state constitution is to mean anything, it must be enforced where it is the only law capable of providing a final answer to a claim, and a party, such as this defendant, has invoked its protections.

Our duty to enforce the fundamental law of Vermont, our role in the federalist system, and our obligation to the parties thus compel us to address the defendant's suppression motions under the Vermont Constitution. We now turn to that analysis.

## A.

In pertinent part, article ten of chapter one of the Vermont Constitution provides:

> That in all prosecutions for criminal offenses, a person hath a right to be heard by himself and his counsel; to demand the cause and nature of his accusation; to be confronted with the witnesses; to call for evidence in his favor, and a speedy public trial by an impartial jury of the country; without the unanimous consent of which jury, he cannot be found guilty; nor can he be compelled to give evidence against himself; nor can any person be deprived of his liberty, except by the laws of the land, or the judgment of his peers . . . .

Long before the advent of the modern federal protections for individual rights, we have interpreted article ten as proscribing involuntary confessions. In *State v. Hobbs*, 2 Tyl. 380 (1803), this Court upheld the conviction of a jailer for torturing his prisoner, and described the meaning of article ten:

> In this concise and luminous display of the rights of the citizens of this State, especially in the penultimate clause, all compulsory process to enforce an acknowledgement of guilt is for ever excluded, not only from judicial proceedings, but all attempts of individuals to extort confession by bodily suffering is reprobated.

*Id.* at 383.

That same term, we noted the requirement that confessions be voluntary, see *State v. Jenkins*, 2 Tyl. 377, 378 (1803), although we did not reverse the conviction on the facts of that case, see *id.* at 378–79. In 1839, we adopted the requirement that a confession must be voluntary to be admitted, and that a conviction will be reversed if an involuntary confession is admitted. *State v. Phelps*, 11 Vt. 116, 121 (1839). Although *Phelps* does not cite to article ten, the *Hobbs* case certainly clarifies the roots of the rule. Thus, as recognized in the early jurisprudence of this Court, an involuntary confession violates article ten's injunction that a person cannot "be compelled to give evidence against himself."

While differing over what conduct renders a confession involuntary, compare *State v. Blair*, 118 Vt. 81, 85–89, 99 A.2d 677, 680–82 (1953), with *State v. Walker*, 34 Vt. 296,

301–03 (1861), this Court has never wavered from the requirement of voluntariness. See, e.g., *State* v. *Lapham, supra,* 135 Vt. at 400, 377 A.2d at 253; *State* v. *Blair, supra,* 118 Vt. at 85, 99 A.2d at 680. Today, we reaffirm our previously expressed view that article ten of chapter one of the Vermont Constitution prohibits the obtainment of involuntary confessions. Accordingly, involuntary confessions are inadmissible in all criminal trials in Vermont. See also *In re E. T. C., supra,* 141 Vt. at 379–80, 449 A.2d at 940.

As noted previously in this opinion, the defendant's first confession was excluded as involuntary, and the State has not challenged that ruling on appeal. As the above discussion reveals, the involuntariness of that confession is fatal to its admissibility under the Vermont Constitution. We now turn to the impact of this violation on the admissibility of the second confession and the defendant's clothing.

### B.

Vermont's law on the exclusion of illegally obtained evidence, and the exclusion of evidence that is the fruit of illegal police conduct, has undergone substantial changes in the last century. It is time that we clarified the state of our law. In *State* v. *Slamon,* 73 Vt. 212, 50 A. 1097 (1901), we held that articles ten and eleven of chapter one of the Vermont Constitution required the suppression of evidence seized in violation of those provisions. See *id.* at 214–15, 50 A. at 1098–99.[5] Subsequently, we retreated from this position. In *State* v. *Krinski,* 78 Vt. 162, 62 A. 37 (1905), we allowed the admission of contraband seized in violation of the Vermont Constitution. See *id.* at 165–66, 62 A. at 37. Then in *State* v. *Stacy,* 104 Vt. 379, 160 A. 257 (1932), we announced that intervening cases had completely overruled *Slamon,* and held that evidence would be admitted regardless of the constitutionality of its obtainment. *Id.* at 401–02, 160 A. at 266. Similarly, in *State* v. *Cocklin,* 109 Vt. 207, 194 A. 378 (1938), we held that

---

[5] The *Slamon* decision has its roots in early Vermont case law. In *State* v. *J. H.,* 1 Tyl. 444, 448 (1802), this Court invalidated an arrest for failure to comply with the warrant requirement of article eleven.

evidence discovered as a result of an involuntary confession could be admitted at trial. See *id.* at 212–13, 194 A. at 380.

Our more recent decisions have effected yet another change, this time reinstating the *Slamon* rule. In *State* v. *Miner*, 128 Vt. 55, 258 A.2d 815 (1969), we upheld a claim for suppression of statements under the Vermont and Federal Constitutions. See *id.* at 70–71, 258 A.2d at 824. *State* v. *Hohman*, 136 Vt. 341, 392 A.2d 935 (1978), upheld the defendant's claim that certain incriminating admissions "were improperly admitted at trial in violation of [the defendant's] right against self-incrimination under the Fifth Amendment to the United States Constitution and Chapter I, Article 10 of the Vermont Constitution." *Id.* at 346, 392 A.2d at 939. Our clearest statement on the issue came in *State* v. *Dupaw*, 134 Vt. 451, 365 A.2d 967 (1976):

> Therefore, to effectuate the fundamental guarantees provided by the Fourth Amendment of the United States Constitution and the Eleventh Article of our State Constitution, we feel that the exclusionary prohibition should be extended to cover the indirect as well as the direct products of the unlawful arrest.

*Id.* at 453, 365 A.2d at 968.

Most recently, we reversed an adjudication of delinquency on the exclusive authority of the Vermont Constitution. *In re E. T. C.*, *supra*, reversed the trial court because of the added protections the Vermont Constitution affords juveniles against forfeiture of their rights against self-incrimination and to counsel. Statements were obtained from the juvenile in violation of these rights. We held that the introduction of these statements at trial required reversal on the exclusive authority of the Vermont Constitution. See *id.* at 379–80, 449 A.2d at 940.

Thus, our decisions have come full circle. The positions adopted in cases such as *State* v. *Krinski*, *supra*, have now been unequivocally repudiated. Cf. *State* v. *Blondin*, 128 Vt. 613, 617, 270 A.2d 165, 167 (1970) (noting that *State* v. *Stacy*, *supra*, was overruled under the United States Constitution by *Mapp* v. *Ohio*, *supra*). Evidence obtained in violation of the Vermont Constitution, or as the result of a viola-

tion, cannot be admitted at trial as a matter of state law. Introduction of such evidence at trial eviscerates our most sacred rights, impinges on individual privacy, perverts our judicial process, distorts any notion of fairness, and encourages official misconduct. See Mertens and Wasserstrom, *Foreward: The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law,* 70 Geo. L.J. 365, 376–89 (1981). We must now examine the impact of these principles on the defendant's motions to suppress the second confession, clothing, and shoes under the Vermont Constitution.

## C.

We believe that the initial violation of article ten (the procuring of an involuntary confession) tainted both the second confession and the seizure of the clothing, and requires suppression of these items as well. As discussed previously, the second confession was clearly a direct product of the initial illegality, namely, the illegally obtained first confession. Unlike *State* v. *Rocheleau, supra,* 131 Vt. at 571–72, 313 A.2d at 39–40, there were no intervening events to purge this taint. Indeed, the pattern of police misconduct evidenced throughout this investigation continued unabated. The second confession was therefore properly suppressed under article ten of the Vermont Constitution. See *State* v. *Dupaw, supra,* 134 Vt. at 453, 365 A.2d at 968.

Similarly, the clothing given to the police by the defendant's father is an illegal fruit of the involuntary confession. As the trial court's findings reveal, immediately after wringing an involuntary confession from a distressed juvenile, the police drove to the defendant's home to obtain evidence corroborating that confession. The ground urged by the State to uphold this action, the consent of the father, cannot dissipate the connection between the illegal confession and this seizure. As the trial court found, the same police misconduct which rendered the confession involuntary also tainted the father's consent. Most important, the seizure of the clothing is too directly connected to the illegal confession to allow admission of the clothing. See *id.; State* v. *Rocheleau, supra,* 131 Vt. at 570, 313 A.2d at 39. Both the clothing and the

second confession must therefore be suppressed as the direct products of violations of the defendant's Vermont constitutional rights.

### D.

The above analysis cannot be applied to the seizure of the bloodstained shoes. That seizure preceded the illegal police conduct which required suppression of the initial confession. Thus, in no way could the shoes be deemed a fruit of the illegal confession. As we have already held, the consent to the taking of the shoes was involuntary. However, as we noted under the Federal Constitution, the involuntariness of the consent does not necessarily invalidate the seizure under the Vermont Constitution. We conclude that the shoes are admissible under the Vermont Constitution.

Article eleven of chapter one of the Vermont Constitution provides:

> That the people have a right to hold themselves, their houses, papers, and possessions, free from search or seizure; and therefore warrants, without oath or affirmation first made, affording sufficient foundation for them, and whereby by any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

Article eleven of the Vermont Constitution has been construed to prohibit unreasonable searches and seizures. See *Lincoln* v. *Smith*, 27 Vt. 328, 346 (1855). The issue, then, is whether this particular seizure is justified under article eleven.

As discussed previously, the police had ample reason to conclude that the shoes were incriminating evidence. The evidence was manifestly vulnerable to easy destruction. The officers did not pry into the defendant's privacy, but took an item openly displayed to the public, based on the compelling need to obtain this evidence. Further, had the police chosen instead to obtain a warrant, far more restrictive actions would have been required to preserve the evidence. The police would

have had to restrain the defendant, perhaps for hours, until a warrant could have been obtained.

We therefore conclude that this seizure did not violate article eleven of the Vermont Constitution. The police employed the least restrictive method to obtain manifestly incriminating, yet vulnerable, evidence which was openly displayed, with no attempt at concealment. Article eleven requires no more.

*The portion of the order suppressing the defendant's second confession and clothing is affirmed. The portion of the order suppressing the shoes is reversed.*